Stephen M. Lobbin (SBN 181195)
sml@smlavvocati.com
Joshua N. Osborn (SBN 317435)
jno@smlavvocati.com
**SML Avvocati P.C.**
4640 Cass Street #90142
San Diego, California 92109
Tel: 949.636.1391

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| **Miramar Brands Group, Inc.**, a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>**Rag & Bone Holdings, LLC**, a Delaware limited liability company,<br><br>Defendant. | Case No. 8:26-cv-00011<br><br>**COMPLAINT FOR TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION**<br><br>**DEMAND FOR JURY TRIAL** |

For its Complaint, Plaintiff Miramar Brands Group, Inc. ("MBG") hereby alleges as follows:

**JURISDICTION AND VENUE**

1.  This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Lanham Act, 15 U.S.C. §§ 1114 and 1125, and under 28 U.S.C. § 1367 as to related state-law claims.

2.  This Court has personal jurisdiction over Defendant Rag & Bone Holdings, LLC ("Rag & Bone") because it has committed its unlawful acts alleged herein in California and in this District, and it regularly conducts business in this

District and/or engages in continuous and systematic activities in this District. Rag & Bone has purposefully directed infringing sales and advertising into this District through interactive websites and online marketplaces accessible to, and used by, consumers in this District.

3. Venue is proper in this District under 28 U.S.C. §§ 1391(b)-(c).

## PARTIES

4. Plaintiff Miramar Brands Group, Inc. ("MBG") is a privately-held California corporation, with its principal place of business in Corona del Mar, California. MBG was founded in 1983 by, among others, Stephen Yount Ascher, Jr. and Olympian Christopher St. John "Sinjin" Smith. MBG owns and licenses a portfolio of registered trademarks and sports-entertainment formats, including the "Miramar" and "King of the Beach" and "King of the Court" brands, and related apparel and athleisure lifestyle goods.

5. Upon information and belief, Defendant Rag & Bone is a Delaware limited liability company having its principal place of business in New York. Rag & Bone offers for sale and sells the accused infringing products including in California, including within this District.

## BACKGROUND FACTS

6. MBG's official websites include miramarbrands.com, miramarstores.com, miramar.shop, miramarmarine.com, miramarofficial.com, miramardenim.com, kingofthebeach.com, kingofthecourt.com and queenofthesnow.com. MBG's social media handles include @miramar, @miramarfilm, @kingofthebeachusa, @queenofthebeachusa and others. MBG's foundational brands include MIRAMAR®, SIDEOUT®, QUEEN & KING OF THE BEACH®, QUEEN & KING OF THE COURT® and QUEEN & KING OF THE SNOW® used in connection with apparel, sportswear, lifestyle goods, accessories and globally-promoted sports and media events (collectively the "Crown

Brands"). Attached herewith as **Exhibit A** is a true and correct copy of selected pages from MBG's websites.

7. MBG licenses its brands and trademarks extensively, and provides brand management and consulting services in fashion, sports, and global retail media networks to long-term partners including Hearst Corporation and Lagardère. MBG holds minority ownership and/or investment interests in certain heritage lifestyle brands, including those of Hang Ten® and Lightning Bolt®. MBG has licensed and created collaborations involving the ELLE® and ELLE Decor® brands and others. These partnerships have generated substantial retail revenues for brands MBG manages for more than 20 years.

8. MBG's brands including MIRAMAR® are the primary trademarks used in connection with MBG's collaboration and sponsorships of the primary worldwide professional beach volleyball tours, called "Queen & King of the Beach®" and "Queen & King of the Court®" which cater to the 25-35 year old global consumer and athleisure sports enthusiasts. The MIRAMAR® trademark appears extensively on signage and most clothing worn in connection with these amateur and professional beach volleyball events and tours and related activations, including ELLE-branded beach lifestyle integrations in collaboration with MBG.

9. MBG has taken measured and consistent steps and actions to protect and police its global trademark rights, including preventing others from conflicting uses. For example, based on MBG's longstanding use of its MIRAMAR® trademark alone and, at minimum, its U.S. trademark use and priority dating back to no later than 2009, MBG has been granted many trademark registrations including (a) incontestable U.S. Trademark Registration No. 3,891,117 ("the '117 Registration") for MIRAMAR (stylized), and (b) incontestable U.S. Trademark Registration No. 3,891,118 ("the '118 Registration") for MIRAMAR®. Both of these registrations are in International Class 25 for clothing, including "swimwear, tops, shirts, T-shirts, sweatshirts, tank tops, vests, blouses, coats, overcoats, suits,

jackets, sports coats, sweaters, pullovers, jumpers, skirts, dresses, body suits, leotards, leggings, pants, trousers, sweatpants, shorts, gloves, socks, underwear, and belts; headwear, namely, caps, hats, and visors; footwear, namely, shoes and sandals, sleepwear, athletic uniforms, in Class 25." MBG has also been granted European Union Trademark Registration No. 015811541. Attached herewith as **Exhibits B-C** are true and correct copies of the '117 and '118 registrations.

10. MBG has a long and well-documented history of protecting its trademarks through appropriate legal and administrative channels when necessary, including seeking court relief against substantially larger entities. For example, MBG previously enforced the SIDEOUT® trademarks in a widely-reported dispute against Nike's infringing "SIDE ONE" branding, a classic "David-versus-Goliath" matter that resulted in the cessation of Nike's infringing use. MBG has enforced its Crown Marks consistently for decades—prevailing against global apparel conglomerates, individual infringers, and junior registrants alike—while maintaining a restrained, injunctive-focused enforcement posture.

11. MBG's measured approach to trademark enforcement was further confirmed in *Miramar Brands Group, Inc. v. Fonoimoana*, Case No. 16-cv-04224 (C.D. Cal.), a federal action involving Eric Fonoimoana and a junior party's attempted appropriation of MBG's Queen-format Crown Marks in connection with beach volleyball events. There, MBG sought only injunctive relief to halt infringing use and expressly waived any claim for monetary damages, underscoring that MBG's objective was protection of brand integrity—not financial leverage. During proceedings, this Court repeatedly rejected the junior party's reliance on later trademark registrations and rejected efforts to curtail MBG's senior rights, confirming that MBG lawfully owned and controlled the relevant Crown Marks and that the junior party's contrary position was untenable. The Court further recognized the inherent logical relationship among MBG's Crown Marks— acknowledging that Queen-formative marks naturally relate to and derive from

MBG's senior King-formative marks—and dismissed belated attempts to inject abandonment or reverse-confusion theories. MBG ultimately prevailed, confirming that its Crown Marks function as a unified family and that MBG enforces those rights in a consistent, restrained, and judicially approved manner.

12. MBG's enforcement efforts have also extended to protecting its marks in connection with major media and real-estate developments, including requiring changes to third-party branding in the feature film *Father of the Bride*. MBG resolved trademark issues involving Caruso Property Management through proceedings before the United States Patent and Trademark Office including a negotiated resolution permitting limited, differentiated uses. This consistent history of measured enforcement underscores that MBG's actions here are part of a longstanding practice of protecting its intellectual property in an even-handed manner.

13. MBG has licensed, has minority interests in and/or has entered into long-term partnership agreements involving the MIRAMAR® trademark with many companies, including Spalding (a Berkshire Hathaway company), Fruit of the Loom and its Russell Brands division, Vanity Fair brands and Union Underwear, Lagardère and Hearst's ELLE and ELLE Decor brands, American Brand Holdings and its Hang Ten® brand, Mikasa Corporation, Sportworx B.V. in The Netherlands, the Fédération Internationale du Volleyball ("FIVB"), and The Amateur Athletic Union of the United States ("AAU"). MBG also has pending license, partnership, collaboration and/or other agreements, including with Northaven Brand Holdings for sportswear and athleisure apparel, and Smack Sportswear for activewear. MBG's partnerships and brand value have been adversely impacted by Rag & Bone's infringing use of MIRAMAR.

14. Attached herewith as **Exhibit D** are true and correct images of some of MBG's clothing items, which are sold under long-term licenses online as well as retail outlets that include Amazon, TikTok, Meta, MBG's own websites and social

media handles, major sporting goods and retail outlets, both online and brick-and-mortar. MIRAMAR®-branded items include t-shirts, sweatshirts, hoodies, joggers, headwear, accessories, volleyballs, denim hats and jackets. MBG's products are typically priced at premium levels and cater to 25-35 year old athleisure and sports enthusiasts worldwide; for example, a sweatshirt for $88.50, sweatpants for $77.50, t-shirts for $32-60, a bomber jacket for $650, net systems for over $1,000 and premium, genuine leather beach volleyballs for over $99.

15. On April 2, 2024, Rag & Bone executed an Intellectual Property Assignment Agreement unrelated to, and expressly excluding, any rights in or goodwill associated with the MIRAMAR name. Rag & Bone started using the MIRAMAR brand online without permission beginning in or about mid-2025, and to such an extent that MBG started losing its visibility and brand association across major online platforms including Amazon, Google, eBay, Yahoo, Meta, TikTok and other digital search and commerce channels, for example in search results for "MIRAMAR" and "MIRAMAR + CLOTHING." The confusion and resulting harm related to MIRAMAR-branded products and clothing has accelerated in recent weeks, materially harming the value of MBG's MIRAMAR® brand and others that it owns or controls. True and correct copies of representative marketplace and search-result displacement evidence are attached herewith as **Exhibits E-G.**

16. As the senior and incontestable owner of the MIRAMAR® brand and trademarks, MBG is expressly entitled — and in many instances required — by major digital commerce and social media platforms, including Amazon and Meta, to participate in brand-registry programs designed to prevent U.S. and international consumer confusion, counterfeiting, and trademark infringement. These programs operate through automated and semi-automated enforcement systems governed by platform Terms of Service ("TOS") that prohibit unauthorized use of registered marks. MBG does not target individual sellers or employees of third-party companies; rather, enforcement actions are initiated and processed pursuant to

platform trademark policies once infringing uses are detected. Rag & Bone's employees' subsequent complaints and demands that MBG "retract" enforcement actions — many of which MBG did not initiate or control — reflect the operation of platform-controlled brand-protection mechanisms and trademark law, not any misconduct by MBG. Rag & Bone's rush to federal court to halt lawful enforcement thus represents an effort to weaponize judicial process to preserve and expand its infringing use of MIRAMAR®, rather than a legitimate response to any wrongful conduct by the senior mark owner.

17. This action presents a classic case of reverse confusion, in which a powerful junior user has adopted and promoted a mark in a manner that overwhelms and displaces the identity of a senior California brand. Rag & Bone is a New York-based fashion house that chose to use the MIRAMAR name recklessly, without clearing the name and without acquiring any rights to use MBG's already-existing brands. As a result of Rag & Bone's extensive marketing and online "saturation" beginning in mid-2025, consumers increasingly associate the name MIRAMAR with Rag & Bone rather than with MBG, the owner of the brand.

18. Upon information and belief, Rag & Bone adopted MIRAMAR in 2025 as a collection and brand signifier to generate market momentum in core apparel categories, notwithstanding MBG's senior rights.

19. On June 9, 2025 Rag & Bone filed U.S. Trademark Application Serial No. 99224195 for the proposed trademark RAG & BONE / MIRAMAR. Rag & Bone acknowledged that it had not yet used MIRAMAR as an asserted trademark; rather, it stated its "intent to use" the mark. Recently on October 30, 2025, the U.S. Trademark Office rejected the application via a "Section 2(d) Refusal—Likelihood of Confusion" for many reasons, primarily based on MBG's '117 Registration and '118 Registration. Attached herewith as **Exhibit H** is a true and correct copy of the October 30, 2025 Office Action. In the Office Action, the U.S. Trademark Office made findings and conclusions including the following.

20. As the Trademark Office explained, "Trademark Act Section 2(d) bars registration of an applied-for mark that is so similar to a registered mark that it is likely consumers would be confused, mistaken, or deceived as to the commercial source of the goods and/or services of the parties. *See* 15 U.S.C. §1052(d). Likelihood of confusion is determined on a case-by-case basis by applying the factors set forth in *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 1361, 177 USPQ 563, 567 (C.C.P.A. 1973) (called the "*du Pont* factors"). . . . Although not all *du Pont* factors may be relevant, there are generally two key considerations in any likelihood of confusion analysis: (1) the similarities between the compared marks and (2) the relatedness of the compared goods and/or services."

21. Concerning the factor of "Similarity of the Marks," the Trademark Office concluded: "In this case, both marks share the similar wording, MIRAMAR. This similarity creates a confusingly similar commercial impression because consumers are likely to believe that registrant's mark is a condensed form of applicant's mark or that registrant has begun offering similar goods and services under another iteration of its registered mark. Thus, the addition of wording does not create a distinct commercial impression that distinguishes applicant's mark from registrant's mark."

22. Concerning the factor of "Relatedness of the Goods and Services," the Trademark Office concluded: "The attached Internet evidence establishes that the same entity commonly manufactures, produces, or provides the relevant goods and/or services and markets the goods and/or services under the same mark. Thus, applicant's and registrant's goods and/or services are considered related for likelihood of confusion purposes. . . . The marks create the same commercial impression and the attached evidence illustrates that the goods and services are commercially related and are likely to be encountered together in the marketplace by consumers. Accordingly, consumers are likely to be confused and mistakenly

believe that the products and services originate from a common source. Therefore, registration must be refused."

23. Rag & Bone has requested an extension of time to respond to the Office Action. In the meantime, Rag & Bone has continued and expanded its MIRAMAR rollout notwithstanding MBG's August 28, 2025 cease-and-desist letter. In an action filed recently in New York—*Rag & Bone Holdings, LLC et al. v. Miramar Brands Group, Inc.*, Case No. 1:25-cv-09937-LGS (S.D.N.Y)—Rag & Bone has asserted many allegations, including that "Rag & Bone at no time has committed trademark infringement [because] there is no reasonable argument that confusion is even likely." Rag & Bone did not address the USPTO's October 30, 2025 findings regarding likelihood of confusion, because no defense to those findings is plausible.

24. The Rag & Bone MIRAMAR product line "includes among other things, pants, shorts, shirts, dresses, and T-shirts," as admitted in its recent action. Beginning in 2025, Rag & Bone expanded promotion of its infringing MIRAMAR line that has become popular with consumers, to the point that searches for "MIRAMAR clothing" prominently display Rag & Bone's MIRAMAR products in sponsored and paid search results ahead of MBG's products and official websites. Attached herewith as **Exhibit I** are true and correct images of some of Rag & Bone's clothing items, which are sold online as well as in retail outlets including Amazon, Google, T.J. Maxx, and other places in competition with MBG's clothing items. Rag & Bone's items are typically priced at premium levels; for example, sweatpants priced approximately $100-$200.

25. There have been several examples of actual confusion. For example, several individuals including Mr. Theodore Jaffrey, Mr. Moses Khuu and Mr. Dale Waters have contacted MBG and asked about Rag & Bone's use of MBG's MIRAMAR brand. Attached herewith as **Exhibit J** are true and correct copies of these communications.

26. Rag & Bone's infringing use of Miramar® and its ensuing efforts to mischaracterize lawful brand-registry enforcement have also caused reputational harm to MBG's long-standing commercial relationships. For example, a senior executive of Nordstrom — a retail partner with whom MBG has maintained a trusted relationship for decades — contacted MBG directly to question why infringement issues had arisen at all, reflecting confusion and concern generated by Rag & Bone's conduct rather than any change in MBG's even-handed enforcement practices. At the same time, searches for "Miramar" on major retail platforms, including Nordstrom.com and other retail partners, continued to surface Rag & Bone's MIRAMAR-branded products notwithstanding MBG's proper enforcement efforts. This distortion of marketplace signals and strain on established business relationships constitutes irreparable harm to MBG's goodwill and reputation that cannot be remedied by monetary damages alone. Through its reckless adoption and saturation use of MIRAMAR, Rag & Bone has collapsed the integrity of MBG's long-standing brand relationships, including relationships that had remained stable and uncontested for decades prior to Rag & Bone's infringement.

27. Rag & Bone's infringing use of "MIRAMAR" has been amplified in reputable fashion and mainstream consumer press within the Hearst publishing ecosystem. *ELLE Magazine* published a Black Friday feature highlighting Rag & Bone's "Miramar" sweatpant jeans collection as a shopping pick, without reference to MBG's senior and incontestable MIRAMAR® brand. A true and correct copy of this article is attached herewith at **Exhibit F**. This misattribution is particularly injurious because *ELLE Magazine* is owned by Hearst, a long-standing editorial and commercial partner within MBG's brand-and-licensing ecosystem.

28. Even more striking, in a nationally distributed issue of *Oprah's Daily*—a Hearst publication—Rag & Bone's "MIRAMAR" jeans were selected and featured as an editorial shopping "pick," again without reference to MBG's senior MIRAMAR® brand. A true and correct copy of this article is attached herewith at **Exhibit G**.

29. These unpaid editorial placements underscore the immediacy and severity of the reverse-confusion harm: Defendants' junior use is being amplified by reputable third parties, causing consumers to associate "MIRAMAR" with Rag & Bone rather than with MBG. These examples further reflect marketplace exposure to Rag & Bone's MIRAMAR branding through trade-press and retail-media coverage and related marketplace displacement evidence.

30. Based on the foregoing, MBG is the senior owner of its registered MIRAMAR® trademarks, having used the marks continuously for decades in connection with its California lifestyle apparel, sports, and global brand extensions. Defendant Rag & Bone, a national fashion retailer and marketer, knowingly and recklessly adopted MIRAMAR as a collection name and brand signifier in 2025. By saturating the market through national retail distribution, paid digital advertising, influencer campaigns, and algorithm-driven promotions, Rag & Bone has caused consumers to believe—incorrectly—that MBG's senior brand MIRAMAR® is affiliated with, derived from, or subordinate to Rag & Bone. The harm to MBG is already occurring and is accelerating, as confirmed by platform-level confusion across Amazon, Meta and Google, including search-engine displacement that has effectively erased MBG's MIRAMAR® brand identity online.

## FIRST CLAIM FOR RELIEF
### (Trademark Infringement)

31. MBG incorporates by this reference all of the allegations stated in the above paragraphs.

32. Under 15 U.S.C. § 1114(1)(a) and § 1125(a), Defendant is liable for infringement of MBG's MIRAMAR® trademarks, including the '117 Registration and '118 Registration, because Defendant has, without consent, used in commerce the name MIRAMAR in connection with the sale, offering for sale, distribution and/or advertising of its associated products, which use is likely to cause confusion, or to cause mistake, or to deceive consumers as to the source, sponsorship, or affiliation of the parties' competing products.

33. The first factor concerning a likelihood of confusion is the similarity of the marks. As the Trademark Office has already determined, Rag & Bone's use of MIRAMAR is very similar, including because it "creates a confusingly similar commercial impression because consumers are likely to believe that registrant's mark is a condensed form of applicant's mark or that registrant has begun offering similar goods and services under another iteration of its registered mark."

34. The second factor concerning a likelihood of confusion is the relatedness of the parties' goods. As the Trademark Office has already determined, "The marks create the same commercial impression and the attached evidence illustrates that the goods and services are commercially related and are likely to be encountered together in the marketplace by consumers. Accordingly, consumers are likely to be confused and mistakenly believe that the products and services originate from a common source."

35. The third factor concerning a likelihood of confusion is the marketing channels used by the parties. As referenced herein, the primary marketing channels for both parties are online channels including Google, Meta and Amazon, driving search results for MIRAMAR to the consumer's point of purchase. As the Trademark Office explained, the parties' products "are likely to be encountered together in the marketplace by consumers."

36. The fourth factor concerning a likelihood of confusion is the strength of the trademark at issue. As noted, MBG's MIRAMAR® trademarks are registered, and the registrations are incontestable. As such, the trademarks are presumed to represent, and do represent, strong trademark rights.

37. The fifth factor concerning a likelihood of confusion is the intent behind the accused infringing use. While intent is difficult to ascertain directly, the circumstantial evidence allows an inference of intent, including the fact that Rag & Bone has proceeded recklessly in adopting and using the name MIRAMAR in the face of not only MBG's conflicting trademark MIRAMAR® registrations, but the experts at the Trademark Office have specifically concluded there is a likelihood of confusion.

38. The sixth factor concerning a likelihood of confusion is any evidence of actual confusion. As referenced herein, reasonable consumers have been confused by Rag & Bone's use of the MIRAMAR name which was mistakenly believed to be associated with MBG's longstanding and distinctive MIRAMAR® brand.

39. The seventh factor concerning a likelihood of confusion is the likelihood of expansion into other markets. Because MBG's primary business model is licensing its brands, including MIRAMAR®, MBG is inherently likely to expand its MIRAMAR® brand into other new markets.

40. The eighth factor concerning a likelihood of confusion is the degree of care likely to be exercised by purchasers. The parties' products are clothing primarily, which although not inexpensive, do not compel most consumers to exercise inordinate brand scrutiny to the extent needed to avoid a likelihood of confusion.

41. On information and belief, Defendant has engaged in its infringing acts with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

42. On information and belief, Defendant's trademark infringement has been willful, has resulted in and continues to result in unjust enrichment, and has injured MBG's business.

43. MBG also has suffered and continues to suffer irreparable injury, including damage to customer relationships because of Defendant's trademark infringement. Such irreparable injury cannot be remedied adequately unless Defendant is enjoined immediately from further unfair competition and commanded to rectify the status quo ante.

44. MBG is entitled to a rebuttable presumption of irreparable harm upon a showing of likelihood of success on the merits (15 U.S.C. § 1116(a)). The loss of control over the MIRAMAR® mark's identity and goodwill, including consumer confusion and marketplace displacement described above, is not readily quantifiable and constitutes irreparable harm.

## SECOND CLAIM FOR RELIEF

### (Unfair Competition)

45. MBG incorporates by this reference all of the allegations stated in the above paragraphs.

46. By its acts alleged herein, Defendant has knowingly engaged in unfair acts or practices and unfair methods of competition, including but not limited to making misrepresentations about its products, and otherwise engaging in deceptive trade practices and unlawful, unfair or fraudulent business acts or practices, in violation of Cal. Bus. & Prof. Code § 17200.

47. Defendant's unfair competition has resulted in and continues to result in unjust enrichment and was undertaken willfully to injure MBG's business.

48. MBG also has suffered and continues to suffer irreparable injury, including damage to customer relationships because of Defendant's unfair competition. Such irreparable injury cannot be remedied adequately unless

Defendant is enjoined immediately from further unfair competition, and commanded to rectify the status quo ante.

## PRAYER FOR RELIEF

Therefore, Plaintiff MBG prays for the following relief:

A. A determination that Defendant has infringed one or more of MBG's trademarks;

B. A determination that Defendant has engaged in unfair competition in violation of Cal. Bus. & Prof. Code § 17200;

C. An accounting for damages adequate to compensate for Defendant's trademark infringement and/or unfair competition, including Defendant's profits, any damages sustained by MBG, and the costs of the action, including under 15 U.S.C. § 1117(a), and including increased and/or treble damages;

D. Equitable relief including a preliminary and permanent injunction prohibiting further unlawful actions;

E. A determination that this is an exceptional case, and an award of costs, expenses and attorney fees to MBG;

F. Pre-judgment and post-judgment interest on such monetary relief; and

G. Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b) and L.R. (C.D. Cal.) 38-1, Plaintiff hereby demand a jury trial on all the issues so triable in this action.

Respectfully submitted,

Dated: January 4, 2026       **SML AVVOCATI P.C.**

By: /s/ Stephen M. Lobbin
    Attorneys for Plaintiff