Stephen M. Lobbin (SBN 181195)
sml@smlavvocati.com
Joshua N. Osborn (SBN 317435)
jno@smlavvocati.com
**SML Avvocati P.C.**
4640 Cass Street #90142
San Diego, California 92109
Tel: 949.636.1391

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| **Miramar Brands Group, Inc.**, a California corporation, | Case No. 8:26-cv-00011-MRA-BFM |
| Plaintiff, | |
| v. | **AMENDED COMPLAINT FOR TRADEMARK INFRINGEMENT, FALSE DESIGNATION OF ORIGIN AND UNFAIR COMPETITION** |
| **Rag & Bone Holdings, LLC**, a Delaware company, **Guess?, Inc.**, a Delaware corporation, **WHP Global, LLC**, a Delaware company, **Bloomingdale's, LLC**, an Ohio company, **Nordstrom, Inc.**, a Washington corporation, **Evereve, Inc.**, a Minnesota corporation, **Revolve Group, Inc.**, a Delaware corporation, **URBN US Retail, LLC**, a Delaware company, **BOP LLC**, a Wisconsin company, **Rue Gilt Groupe, Inc.**, a Delaware corporation, and **Couponology, Inc.**, a New York corporation, | **DEMAND FOR JURY TRIAL**<br><br>Hon. Mónica Ramírez Almadani |
| Defendants. | |

-1-

For its Amended Complaint pursuant to Fed. R. Civ. P. 15(a)(1)(B), Plaintiff Miramar Brands Group, Inc. ("MBG") hereby alleges as follows:

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Lanham Act, 15 U.S.C. §§ 1114 and 1125, and under 28 U.S.C. § 1367 as to related state law claims.

2.      This Court has personal jurisdiction over Defendant Rag & Bone Holdings, LLC ("Rag & Bone") and each of the other Defendants because each has committed its unlawful acts alleged herein in California and in this District, and each regularly conducts business in this District and/or engages in continuous and systematic activities in this District.

3.      For example, Rag & Bone has purposefully directed infringing sales and advertising into this District through (a) interactive websites including at www.rag-bone.com, accessible to and used by California consumers, with a dedicated MIRAMAR-brand commercial storefront at www.rag-bone.com/miramar/; (b) over $600,000 per month in sales from MIRAMAR-brand Amazon listings shipped into California; (c) Rag & Bone brick-and-mortar retail locations in California; and (d) targeted Meta, Instagram, and TikTok advertising directed to California consumers.

4.      For further example, Defendant Evereve, Inc. has likewise purposefully directed infringing sales of "Miramar"-branded apparel into this District through (a) its retail location at 241 Newport Center Drive #611, Newport Beach, California 92660, where on February 21, 2026, Evereve sold three "Miramar"-branded garments to an MBG representative in a single $467.64 transaction; (b) its interactive direct-to-consumer e-commerce platform at evereve.com, which is accessible to and used by California consumers and which returns ten Rag & Bone "Miramar"-designated product listings in response to consumer search queries for the federally-registered MIRAMAR® mark; and (c) Evereve's official, verified

AMENDED COMPLAINT
Case No. 8:26-cv-00011-MRA-BFM

Instagram account, on which Evereve has published its "Is it Miramar?" engagement campaign actively soliciting California-resident consumer interaction with respect to its infringing "Miramar"-branded goods.

5. Venue is proper in this District under 28 U.S.C. §§ 1391(b)-(c).

**PARTIES**

6. Plaintiff Miramar Brands Group, Inc. ("MBG") is a privately-held California corporation, with its principal place of business in Corona del Mar, California. MBG is a sophisticated brand-management company headquartered in California with long-standing global partnership relationships across the fashion, sports, lifestyle, and editorial sectors. MBG was founded in 1983 by, among others, Stephen Yount Ascher, Jr. and Olympian Christopher St. John "Sinjin" Smith. MBG founded, owns and licenses a portfolio of registered trademarks and sports-entertainment formats, including the "Miramar" and "King of the Beach" and "King of the Court" brands, and related apparel and athleisure lifestyle goods.

7. Upon information and belief, Defendant Rag & Bone is a Delaware limited liability company having its principal place of business in New York.

8. Upon information and belief, Defendant Guess?, Inc. is a Delaware corporation having its principal place of business in Los Angeles.

9. Upon information and belief, Defendant WHP Global, LLC is a Delaware company having its principal place of business in New York. WHP Global is a global brand-management enterprise generating over $8.5 billion in annual retail sales across more than 80 countries. WHP Global acquired Rag & Bone in 2024 jointly with Guess? Principals of WHP Global involved in approving the infringing use of the MIRAMAR brand include Yehuda Shmidman, Gregg Donnenfeld and Stanley Silverstein. WHP Global thus operates in the same brand-management services market in which MBG and its affiliated entities have long competed, including the acquisition, licensing, revitalization, and editorial-and-retail commercialization of legacy consumer brand portfolios. WHP Global's

commercialization of "Miramar" as a new brand is not the conduct of a passive corporate-parent acquirer; rather, it is the conduct of a sophisticated, direct horizontal competitor of MBG in the brand-management services market itself.

10.   Upon information and belief, Defendant Bloomingdale's, LLC is an Ohio company having its principal place of business in New York.

11.   Upon information and belief, Defendant Nordstrom, Inc. is a Washington corporation having its principal place of business in Washington.

12.   Upon information and belief, Defendant Evereve, Inc. is a Minnesota corporation having its principal place of business in Minnesota.

13.   Upon information and belief, Defendant Revolve Group, Inc. is a Delaware corporation having its principal place of business in California.

14.   Upon information and belief, Defendant URBN US Retail, LLC dba Anthropologie is a Delaware company having its principal place of business in Pennsylvania.

15.   Upon information and belief, Defendant BOP LLC dba Shopbop is a Wisconsin company having its principal place of business in Wisconsin.

16.   Upon information and belief, Defendant Rue Gilt Groupe, Inc. is a Delaware corporation having its principal place of business in Massachusetts.

17.   Upon information and belief, Defendant Couponology, Inc. is a New York company having its principal place of business in New York.

18.   Upon information and belief, Rag & Bone and each of the other Defendants offers for sale and sells the accused infringing products including in California and within this District.

## BACKGROUND FACTS

19.   This is an action to halt a textbook case of trademark infringement including rampant reverse confusion to such an extent that MBG's senior, incontestable federally-registered MIRAMAR® brand has all but disappeared from the marketplace including particularly online.  The recent cause of the infringement

is that in 2025, Defendant Rag & Bone—backed by Defendant WHP Global, a brand-management enterprise generating over $8.5 billion in annual retail sales—adopted the brand name "Miramar" as the centerpiece of a saturation marketing campaign (supported by approximately $7.7 million in marketing and advertising spend on the "Miramar Collection," as Defendants' Senior Vice President of Marketing testified under oath) that has overwhelmed MBG's senior brand identity across Amazon, Google, Meta, and mainstream consumer press.  Through this Amended Complaint, MBG seeks injunctive relief, an accounting, enhanced damages, and corrective relief to restore the brand identity that Defendants' junior use has displaced.

20.    MBG's official websites include miramarbrands.com, miramarstores.com, miramar.shop, miramarmarine.com, miramarofficial.com, miramardenim.com, kingofthebeach.com, kingofthecourt.com and queenofthesnow.com.  MBG's social media handles include @miramar, @miramarfilm, @kingofthebeachusa, @queenofthebeachusa and others.  MBG's foundational brands include MIRAMAR®, SIDEOUT®, QUEEN & KING OF THE BEACH®, QUEEN & KING OF THE COURT® and QUEEN & KING OF THE SNOW® used in connection with apparel, sportswear, lifestyle goods, accessories and globally-promoted sports and media events (collectively the "Crown Brands").  Attached herewith as **Exhibit A** is a true and correct copy of selected pages from MBG's websites.

21.    MBG licenses its brands and trademarks extensively, and provides brand management and consulting services in fashion, sports, and global retail media networks to long-term partners including Hearst Corporation and Lagardère.  MBG holds minority ownership and/or investment interests in certain heritage lifestyle brands, including those of Hang Ten®.  MBG has licensed and created collaborations involving the ELLE® and ELLE Decor® brands and others.  These

AMENDED COMPLAINT
Case No. 8:26-cv-00011-MRA-BFM

partnerships have generated substantial retail revenue for brands MBG has managed for more than 20 years.

22.     MBG's brands including MIRAMAR® are the primary trademarks used in connection with MBG's collaboration and sponsorships of the primary worldwide professional beach volleyball tours, called "Queen & King of the Beach®" and "Queen & King of the Court®" which cater to 25-35 year old global consumers and athleisure sports enthusiasts.  The MIRAMAR® trademark appears extensively on signage and on most clothing worn in connection with these amateur and professional beach volleyball events and tours and related activations, including ELLE-branded beach lifestyle integrations in collaboration with MBG.

23.     MBG has taken measured and consistent steps and actions to protect and police its global trademark rights, including preventing others from conflicting uses.  For example, based on MBG's longstanding use of its MIRAMAR® trademark alone and, at minimum, its U.S. trademark priority dating back to no later than 2009, MBG has been granted many trademark registrations including (a) incontestable U.S. Trademark Registration No. 3,891,117 ("the '117 Registration") for MIRAMAR® (stylized), and (b) incontestable U.S. Trademark Registration No. 3,891,118 ("the '118 Registration") for MIRAMAR®.  Both of these registrations are in International Class 25 for clothing, including "swimwear, tops, shirts, T-shirts, sweatshirts, tank tops, vests, blouses, coats, overcoats, suits, jackets, sports coats, sweaters, pullovers, jumpers, skirts, dresses, body suits, leotards, leggings, pants, trousers, sweatpants, shorts, gloves, socks, underwear, and belts; headwear, namely, caps, hats, and visors; footwear, namely, shoes and sandals, sleepwear, athletic uniforms, in Class 25."  MBG has also been granted European Union Trademark Registration No. 015811541.  Attached herewith as **Exhibits B-C** are true and correct copies of the '117 and '118 registrations, respectively.

24.     MBG's senior commercial use of MIRAMAR® extends well beyond International Class 25 apparel and includes continuous retail-store and e-commerce

services dating to at least September 2009.  For example, MBG has owned and operated the domain <miramarstores.com> continuously since September 4, 2009, as evidenced by the public WHOIS registration record.  This domain has been continuously renewed and is currently active through September 4, 2026, with the registration most recently updated on August 28, 2025—the same date MBG served its first cease-and-desist letter related to this action.

25.    The <miramarstores.com> domain forwards to MBG's principal retail e-commerce platform at <miramar.shop>, also branded under the MIRAMAR mark. MBG has operated this MIRAMAR-branded retail-store and e-commerce service continuously for sixteen years—far pre-dating Rag & Bone's first commercial use of any MIRAMAR storefront (*i.e.*, March 17, 2025) by over 15 years.  Accordingly, MBG long ago secured senior trademark rights in and to the MIRAMAR brand for retail-store services and e-commerce services, which are rights independent of and additional to MBG's federally-registered rights in Class 25.

26.    MBG has a long and well-documented history of protecting its trademarks through appropriate legal and administrative channels when necessary, including seeking court relief against substantially larger entities.  For example, MBG previously enforced the SIDEOUT® trademarks in a widely-reported dispute against Nike's infringing "SIDE ONE" branding.  That was a classic "David versus Goliath" matter that resulted in the cessation of Nike's infringing use.  MBG has enforced its Crown Brands consistently for decades—prevailing against global apparel conglomerates, individual infringers, and junior registrants alike—while maintaining a restrained, injunctive-focused enforcement posture.

27.    MBG's measured approach to trademark enforcement is further exemplified in *Miramar Brands Group, Inc. v. Fonoimoana*, No. 16-4224 (C.D. Cal.), a federal action involving a junior party's attempted appropriation of MBG's Crown Brands in connection with beach volleyball events.  MBG sought only injunctive relief to halt infringing use, and expressly waived any claim for monetary

damages, underscoring that MBG's objective was protection of brand integrity—not financial leverage. During proceedings, this Court repeatedly rejected the junior party's reliance on later trademark registrations and rejected efforts to curtail MBG's senior rights, confirming that MBG lawfully owned and controlled the relevant Crown Brands and the junior party's contrary position was untenable. The Court further recognized the inherent logical relationship among MBG's Crown Brands—that is, the Court recognized that Queen-formative marks naturally relate to and derive from MBG's senior King-formative marks—and dismissed belated attempts to inject abandonment or reverse-confusion theories. MBG ultimately prevailed, confirming that its Crown Brands function as a unified family of trademarks and that MBG enforces those rights in a consistent, restrained, and judicially-approved manner.

28. MBG's enforcement efforts also have extended to protecting its marks in connection with major media and real-estate developments, including requiring collaborative changes to third-party branding in the feature film *Father of the Bride*, and the upcoming release of the documentary film *Kings of the Beach*, requiring obligatory trademark mentions by MBG for Miramar® and King of the Beach®, from the global trademark owner.

29. MBG also resolved trademark issues involving Caruso Property Management through proceedings before the U.S. Patent & Trademark Office ("PTO") including a negotiated resolution permitting limited, differentiated uses. The agreement reached in the Caruso matter is a calibrated coexistence framework providing Caruso only composite-mark consent (*i.e.*, "MIRAMAR and another word") for Class 25 use anchored to Caruso's single Rosewood Miramar Beach Hotel, with Caruso ratifying MBG's registrations and withdrawing a Cancellation Action—not a broad grant of trademark rights. This consistent history of measured enforcement underscores that MBG's actions here are part of a longstanding practice of protecting its intellectual property in an even-handed manner.

30.     MBG enforces the MIRAMAR® marks globally and continuously. MBG's all-time Amazon takedown record covering February 2024 through December 2025 documents approximately 1,400 successful text-based trademark takedowns across 22 Amazon storefronts, including amazon.com, amazon.ca, amazon.com.mx, amazon.com.br, amazon.it, amazon.es, amazon.de, amazon.fr, amazon.co.uk, amazon.nl, amazon.pl, amazon.se, amazon.eg, amazon.sa, amazon.ae, amazon.co.jp, amazon.in, amazon.sg, and amazon.com.au.  As recently as May 2-4, 2026, MBG submitted nine Amazon Brand Registry complaints covering more than 130 ASINs against TYR Sport (80+ swimwear ASINs), Faherty Brand (Miramar Muscle Tank, Linen Muscle Tank, and Linen Deep V Sweater listings), and generic third-party sellers — with an acceptance rate exceeding 95%. The breadth and success of MBG's enforcement program establishes that MBG's MIRAMAR® mark is very strong, not weak, abandoned, or selectively enforced against particular infringers.  Amazon's sophisticated program for brand enforcement does not work unless the trademark rights are strong and are being infringed, which was the case when Rag & Bone's use of MIRAMAR was taken down in the fall of 2025.

31.     MBG has licensed, has minority interests in and/or has entered into long-term partnership agreements involving the MIRAMAR® brand with many companies, including Spalding (a Berkshire Hathaway company), Fruit of the Loom and its Russell Brands division, Vanity Fair brands and Union Underwear, Lagardère and Hearst's ELLE and ELLE Decor brands, American Brand Holdings and its Hang Ten® brand, Mikasa Corporation, Sportworx B.V. in The Netherlands, the Fédération Internationale du Volleyball ("FIVB"), and The Amateur Athletic Union of the United States ("AAU").  MBG also has pending license, partnership, collaboration and/or other agreements, including with Northaven Brand Holdings for sportswear and athleisure apparel, and Magnum Ventures for activewear. MBG's partnerships and brand value has suffered adverse and irreparable damages

by Rag & Bone's widespread, commercial, infringing use of MIRAMAR.  The commercial value of MBG's MIRAMAR® brand has been decimated, potentially beyond repair.

32.    The commercial harm to MBG's licensing business is concrete and quantifiable.  Defendants' saturation use of "Miramar" as a new brand has placed MBG's pending and prospective licensing transactions in jeopardy, because licensees cannot acquire clean, exclusive rights to a mark that Defendants are simultaneously saturating across national retail and digital channels.  This licensee attrition is direct evidence of the reverse-confusion harm to MBG's core brand-management and licensing business.

33.    In addition to its federally-registered MIRAMAR® Class 25 rights, MBG holds substantial unregistered common-law rights in the MIRAMAR brand for retail-store services and brand-management services, separately protectable under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  MBG's common-law service mark use of MIRAMAR includes, without limitation: (a) continuous retail-store and e-commerce services use through miramarstores.com, which MBG has owned and operated continuously since September 4, 2009 — constituting sixteen years of uninterrupted commercial use as alleged hereinabove; and (b) continuous brand-management, licensing-program, and brand-portfolio-stewardship services use in connection with the MIRAMAR mark through MBG's long-term partnership agreements with third parties including Hearst Corporation, Lagardère, Spalding (a Berkshire Hathaway company), Mikasa Corporation, the Fédération Internationale du Volleyball, the Amateur Athletic Union, and others, each of which has generated substantial commercial activity, attribution credit, and goodwill associated with the MIRAMAR mark in the brand-management services market.

34.    Rag & Bone's and WHP Global's commercialization of "Miramar" within their own brand-management portfolio — including but not limited to WHP Global's separate attempt to federally register MIRAMAR STORES for the very

retail-store services MBG has continuously operated under miramarstores.com since 2009 — infringes upon MBG's common-law services-mark rights in addition to the registered Class 25 rights, and constitutes the appropriation of a senior brand-management firm's mark by a direct horizontal competitor in the same services market.

35.     Attached herewith as **Exhibit D** are true and correct images of some of MBG's clothing items, which are sold under long-term licenses online as well as in retail outlets including Amazon, TikTok, Meta, major sporting goods and retail outlets (both online and brick-and-mortar), and MBG's own websites and social media handles.  MIRAMAR®-branded items include t-shirts, sweatshirts, hoodies, joggers, headwear, accessories, volleyballs, denim hats and jackets.  MBG's products are typically priced at premium levels and cater to 25-35 year old athleisure and sports enthusiasts worldwide; for example, a sweatshirt for $88.50, sweatpants for $77.50, t-shirts for $32-60, a bomber jacket for $650, net systems for over $1,000, and premium genuine leather beach volleyballs for over $99.

36.     On April 2, 2024, Rag & Bone executed an Intellectual Property Assignment Agreement unrelated to, and expressly excluding, any rights or goodwill associated with the MIRAMAR name.  Sophisticated private equity and global brand management acquisitions do not omit allegedly core trademark assets central to a brand's longstanding commercial identity.  Had MIRAMAR been claimed by Rag & Bone as a commercial trademark with substantial source significance before 2024, it necessarily would have appeared within the acquisition structure.  It did not.  The April 2, 2024 carve-out is also a contemporaneous corporate statement by Defendants Rag & Bone and WHP Global, executed at arm's length between sophisticated parties represented by counsel, that — as of the closing date — MIRAMAR rights and goodwill were not part of the Rag & Bone intellectual property portfolio being conveyed in that transaction.

AMENDED COMPLAINT
Case No. 8:26-cv-00011-MRA-BFM

37.     Notwithstanding that contemporaneous carve-out, fourteen months later, on June 9, 2025, WHP Global's General Counsel Greg Donnenfeld personally verified and swore under oath the federal intent-to-use trademark application for RAG & BONE / MIRAMAR (Serial No. 99224195) — an application that itself acknowledges, in the § 1051(b) intent-to-use basis, that Rag & Bone had not yet used MIRAMAR in commerce as a trademark in the manner now claimed.  The April 2, 2024 contractual exclusion and the June 9, 2025 intent-to-use filing are mutually corroborating evidence that, throughout the relevant period, Rag & Bone's sophisticated principals had no contemporaneous, internal belief in the supposedly thirteen-year-old MIRAMAR brand identity now asserted in this litigation, and proceeded to commercialize MIRAMAR with knowledge of that absence.

38.     Instead, Rag & Bone started using the MIRAMAR brand online and beginning in or about mid-2025.  The began without any knowledge of MBG, or permission from MBG.  No one at MBG had seen or heard about any brand or trademark use by Rag & Bone of the MIRAMAR at that time.  The use by Rag & Bone has been so pervasive, however, that MBG immediately started losing its visibility and brand association across major online platforms including Amazon, Google, eBay, Yahoo, Meta, TikTok and other digital search and commerce channels (for example in search results for "MIRAMAR" and "MIRAMAR + CLOTHING").  The confusion and resulting harm related to MIRAMAR-branded products and clothing has accelerated in recent weeks, irreparably harming the value of MBG's MIRAMAR® brand and others that it owns or controls.  Attached herewith as **Exhibits E-G** are true and correct copies of representative marketplace and search-result displacement evidence.

39.     As the senior and incontestable owner of the MIRAMAR® brand and trademarks, MBG is expressly entitled—and in many instances required by major digital commerce and social media platforms including Amazon and Meta—to participate in brand-registry programs designed to prevent U.S. and international

consumer confusion, counterfeiting, and trademark infringement. These programs operate through automated and semi-automated enforcement systems governed by platform Terms of Service ("TOS") that prohibit unauthorized use of registered marks. MBG does not target individual sellers or employees of third-party companies; rather, enforcement actions are initiated and processed pursuant to platform trademark policies once infringing uses are detected.

40. Amazon's acceptance of 87 of MBG's complaints in September 2025 at a 100% acceptance rate, and Amazon's acceptance of more than 130 complaints against third-party sellers in May 2026 at over 95%, confirms that MBG's enforcement actions are valid platform-validated enforcement of incontestable federally-registered trademarks. Rag & Bone's complaints and demands that MBG "retract" enforcement actions — many of which MBG did not initiate or control — reflect the operation of platform-controlled brand-protection mechanisms and trademark law, not any misconduct by MBG. Rag & Bone's rush to federal court to halt lawful enforcement thus represents an effort to weaponize and abuse judicial process to preserve and expand its infringing use of MIRAMAR, rather than a legitimate response to any wrongful conduct by the senior mark owner.

41. According to the Wayback Machine, the first significant commercial use of Rag & Bone's dedicated MIRAMAR storefront — at www.rag-bone.com/miramar/ — emerged on or about March 17, 2025. Attached herewith as **Exhibit H** is a true and correct copy of the Internet Archive (Wayback Machine) capture history for www.rag-bone.com/miramar/. On June 9, 2025, RB Topco Sagl filed U.S. Trademark Application Serial No. 99224195 for RAG & BONE / MIRAMAR on an intent-to-use basis under 15 U.S.C. § 1051(b) — acknowledging that, as of that date, it had not yet used MIRAMAR in commerce as a trademark in the manner now claimed. In addition to the RAG & BONE / MIRAMAR application, Rag & Bone separately attempted federal registration of MIRAMAR STORES — targeting the very retail-store services MBG has continuously operated

under miramarstores.com since 2009.  Any applicant with 13 years of established prior commercial use would have filed on a use-in-commerce basis under § 1051(a), which Rag & Bone failed to do.  The application was personally verified and sworn under oath by Greg Donnenfeld, General Counsel of WHP Global.

42.  The MIRAMAR STORES application warrants particular attention because it is the subject of an entirely independent senior-rights claim by MBG that does not depend on MBG's Class 25 apparel registrations.  As alleged hereinabove, MBG has owned and continuously operated the domain miramarstores.com since September 4, 2009 — sixteen years of uninterrupted retail-store and e-commerce services use under the MIRAMAR mark, predating Rag & Bone's earliest claimed MIRAMAR storefront use (March 17, 2025) by approximately fifteen years and seven months.  No other party, including any party with whom MBG has entered into a negotiated coexistence framework, has any retail-store-services rights to MIRAMAR.  The Caruso coexistence resolution, in particular, was limited by its terms to composite Class 25 use ("MIRAMAR and another word") anchored to a single hotel property; it conferred no retail-store-services rights on Caruso or anyone else.  Rag & Bone's separate attempt to register MIRAMAR STORES therefore is not merely duplicative of the principal trademark dispute — it is a stand-alone attempt to obtain federal registration of a service mark in a category in which MBG has continuously held senior, uncontested rights for sixteen years and in which Rag & Bone has zero days of prior use.  The MIRAMAR STORES application is further evidence of Defendants' willful and knowing disregard of MBG's senior rights.

43.  By August 2025, Rag & Bone had launched the "Meet Miramar" and "Miramar like you've never seen it before" marketing campaigns on WHP Global's corporate LinkedIn platform, describing "rag & bone / Miramar" as a standalone retail "concept."  Beginning August 20, 2025, Rag & Bone opened three simultaneous MIRAMAR "pop-up shops"—29th Street by the University of Colorado in Boulder, the concourse level of Manhattan's Moynihan Train Hall, and

the American Dream entertainment center in East Rutherford, New Jersey.  These were the first standalone MIRAMAR retail locations in the brand's history.  The Moynihan Train Hall pop-up's exterior signage read: "IT'S MIRAMAR / THIS IS NOT DENIM," as photographed by *Women's Wear Daily*.

44.    On September 5, 2025 — three days *after* MBG's August 28, 2025 cease-and-desist letter — *Women's Wear Daily* ran a profile titled "Rag & Bone's Denim-mimicking Miramar Collection Raises Its Retail Profile."  In the article, Rag & Bone's Senior VP of Marketing, Jess Burns, stated: (a) "Miramar is the new kid on the block to a certain extent" (confirming MIRAMAR is a recent commercial identity, not a 13-year-old established brand); (b) "I believe 45 percent of our women's new customer acquisition is from Miramar" (confirming MIRAMAR is not subordinate to the Rag & Bone house brand, but is the dominant customer-acquisition driver for the entire women's product line business); and (c) "There's this next generation that is learning about Rag & Bone through Miramar.  So we might actually see higher levels of Miramar awareness in certain markets that allows us to create a bridge to the Rag & Bone brand."  Attached herewith as **Exhibit I** is a true and correct copy of the *Women's Wear Daily* profile.

45.    One of the VP's of WHP Global published a corporate LinkedIn post promoting the Fall Miramar Collection, with the headline: "This is not denim.  It's Miramar," and it includes photographs of the Moynihan Train Hall pop-up storefront with "rag & bone /MIRAMAR" illuminated signage and interior signage reading "IT'S MIRAMAR / THIS IS NOT DENIM."  The post characterizes Rag & Bone as "rewriting the rules of denim" through the Miramar Collection and states: "A new generation is discovering Rag & Bone through Miramar — a bridge between a 23-year-old legacy brand and the next wave of consumers."  The post is hashtagged #RagAndBone, #MiramarCollection, #Fall2025, #WHPGlobal, #InnovationInFashion, and #FutureOfDenim — confirming WHP Global's institutional sponsorship.  The post is corporate-officer-authored, WHP-hashtagged

adoption of the "bridge to Rag & Bone" reverse-confusion framing simultaneously articulated by Senior VP Jess Burns to *Women's Wear Daily*.

46. The characterization of Rag & Bone as a "23-year-old legacy brand" is also a self-defeating admission; that is, MBG's MIRAMAR® brand has been in continuous commercial use since 1983, predating the founding of Rag & Bone itself by approximately nineteen years. Attached herewith as **Exhibit J** is a true and correct copy of the LinkedIn post. The LinkedIn post is also direct evidence of competitive harm in the brand-management services market in which both MBG and WHP Global compete—that is, it is a sophisticated brand-management firm (WHP Global) publicly articulating, at the corporate-officer level, a brand-management strategy (the "bridge between a 23-year-old legacy brand and the next wave of consumers" reverse-confusion framing) deployed under a mark ("MIRAMAR") that is owned and continuously used as a brand-management services identifier by a competing brand-management firm (MBG).

47. Defendants' own evidence refutes their litigation position that "Miramar" is used only in a "lockup" with the Rag & Bone house mark. The photographs within Exhibit J depict the Moynihan Train Hall interior bearing standalone, illuminated signage reading "IT'S MIRAMAR" — with no "rag & bone" lockup — directly contradicting the recent sworn direct testimony of Defendants' Chief Merchandising Design Officer that Rag & Bone "always use[s] the word Miramar with Rag & Bone." *See* Exhibit K at 32:20 (true and correct copy of April 13, 2026 Hearing Transcript attached herewith as **Exhibit K**). Defendants' own corporate promotion confirms the same: a Rag & Bone corporate LinkedIn post announced that Defendants were "[d]rafting off the viral momentum of rag & bone / Miramar" and "expanding [their] footprint" with the MIRAMAR pop-up shops, and WHP Global's Chief Executive Officer Yehuda Shmidman personally engaged with that post — further confirming Defendants' knowing, concerted commercialization of MIRAMAR. The public reaction to that post — including a commenter's

declaration that she was "obsessed with Miramar" — reflects precisely the consumer association of the standalone "Miramar" name with Defendants that constitutes the reverse-confusion harm pleaded herein.

48.     Defendants' conduct at the Moynihan Train Hall location after the PTO's October 30, 2025 Section 2(d) refusal both demonstrates willfulness and contradicts Defendants' sworn testimony.  Photographs taken before the refusal show the storefront prominently displaying the "rag & bone / MIRAMAR" lockup; after the refusal, Defendants removed "MIRAMAR" from portions of the exterior storefront signage — itself evidence of consciousness of MBG's senior rights — yet the "rag & bone / MIRAMAR" lockup remained.  As photographed on November 8, 2025 — nine days after the Section 2(d) refusal — the storefront's etched-glass treatments at the Moynihan concourse-level location (near the 8th Avenue and 33rd Street entrance) continued to display the "rag & bone / MIRAMAR" lockup together with "THIS IS NOT DENIM" and "Printed to look like denim.  Feels nothing like it."  The "rag & bone / MIRAMAR" lockup likewise remained on the in-store cash-wrap and in the surrounding station advertising, and the majority of in-store merchandise remained Rag & Bone Miramar-designated, months after the refusal.

49.     Indeed, as photographed on March 15, 2026, although the storefront's exterior header had by then been rebranded to read only "rag & bone NEW YORK," the "rag & bone / MIRAMAR" lockup persisted on the storefront's etched glass and on the Moynihan "SHOP MOYNIHAN" tenant directory on the level above the store, and the in-store merchandise — including the MIRAMAR-branded umbrellas described below — remained MIRAMAR-designated, demonstrating that the exterior name change was a cosmetic, litigation-driven measure while MIRAMAR use continued pervasively.  The Moynihan Train Hall is part of the Penn Station complex, one of the busiest transit hubs in the Western Hemisphere, through which — by published estimates — more than 600,000 passengers pass daily, vastly amplifying the reverse-confusion exposure of Defendants' continued MIRAMAR

use.  This photographic record is directly contradicted by Defendants' sworn hearing testimony that the location is "now just a Rag & Bone pop-up shop" and is "no longer called Rag & Bone Miramar," and is further undercut by the same witness's concession on redirect examination that the "it's not denim, it's Miramar" messaging is, "right now," "used inside the Moynihan Hall pop-up."

50.    Defendants' continued MIRAMAR use also persisted at the American Dream mall in East Rutherford, New Jersey, well after the Section 2(d) refusal.  As photographed on March 15, 2026, an expansive, corridor-length billboard installation at that location (Court D, Level 1) prominently displayed the "rag & bone / MIRAMAR" lockup together with "IT'S NOT DENIM.  IT'S MIRAMAR." and an invitation to "find out why it went viral."

51.    Defendants' application of MIRAMAR across multiple product categories independently refutes their litigation position that "Miramar" merely denotes a denim-printing technique and is not used as a brand.  At the April 13, 2026 hearing, McCormick testified that "Miramar is the way that [Rag & Bone] denote[s] the printing technique," which "emulates denim," and that Rag & Bone does not use "Miramar" "as its own brand."  The record refutes that characterization.  Defendants apply MIRAMAR not only to denim-emulating apparel but to athletic track pants, to a children's line displayed in-store as "rag & bone / Mini / MIRAMAR," and to non-apparel accessories — including MIRAMAR-branded umbrellas offered for sale in-store at the Moynihan location as of March 15, 2026 — none of which is a denim wash or fabric-printing technique. Defendants' official, verified @ragandbone TikTok account has promoted "rag & bone / MIRAMAR" track pants directly to consumers ("Dropping Feb 1.  Save the date."), and Defendants present the "rag & bone / MIRAMAR" designation as standalone store signage, on in-store cash-wraps, and on fitting-room walls, with the Moynihan etched-glass lockup persisting into March 2026.  This cross-category,

source-identifying use confirms that MIRAMAR functions as a brand in its own right, not a mere fabric-printing descriptor.

52.    Rag & Bone's only recent adoption of MIRAMAR as a brand and trademark is independently confirmed by Rag & Bone's own Instagram record on its official, verified @ragandbone account.  At the April 13, 2026 evidentiary hearing in the New York action, Rag & Bone's Chief Merchandising Design Officer of Women's, Jennie McCormick, testified under oath that the "Rag & Bone Miramar collection" was "first introduced [in] 2013" and that Rag & Bone had "sold the Miramar collection continuously since 2013."  That sworn testimony is contradicted by Rag & Bone's own contemporaneous, date-bearing Instagram record.  On October 31, 2023, Rag & Bone promoted the very printed-fleece product line now marketed as "Miramar" as "THE SWEATPANT JEAN"; on November 1, 2023, as "LOOKS LIKE DENIM. Feels nothing like it."; on October 24, 2024, as "FLEECE UNDERCOVER" in "our 'denim' trousers"; on November 18, 2024, as "rbSTRIDE" ("Meet rbSTRIDE — The authentic look of denim with the plush feel of sweats."); and as late as March 24, 2025, as a "spring formula" of "a slim, shrunken mesh tee and long refine knit shorts printed to look like denim."  Attached herewith as **Exhibit L** is a true and correct copy of dated screen captures of these Rag & Bone's Instagram posts.

53.    None of these contemporaneous posts used the word "Miramar."  The earliest appearance of "Miramar" as a product designation in Rag & Bone's Instagram record is on or about May 4, 2025 — as "rb MIRAMAR COTTON TERRY" and "The rb Miramar Sport Stripe Track Pant" — and even thereafter Rag & Bone continued to promote the same product line without the "Miramar" designation (May 20, 2025: "our viral 'jeans'"; May 24, 2025: "Our signature printing technique that looks like denim and feels like sweats").  This documentary record directly contradicts McCormick's sworn "continuously since 2013" testimony and confirms that "Miramar" is a recent 2025 commercial adoption, not a

13-year established brand identity.  On cross-examination, McCormick further admitted that "Miramar" "[i]t's been existing as a style name" and that it "never has existed as a [brand]," and that "even now," she does not think it is a brand.

54.  Defendants have also engaged in a deliberate "washing" scheme designed to launder the junior "Miramar" designation into the appearance of long-standing seniority.  Defendants re-tagged, re-labeled, and re-marketed a printed-fleece product line previously sold under non-"Miramar" designations—including "THE SWEATPANT JEAN" and "rbSTRIDE"—as "Miramar," thereby manufacturing a false appearance of established brand use and obscuring the recency of their 2025 adoption.

55.  A recent test purchase confirms that MIRAMAR is used as a primary brand identifier on physical product packaging delivered to consumers.  An MBG employee purchased a pair of "Miramar Walking Shorts" through Amazon Shopbop, an Amazon-owned luxury retail platform operated by Defendant BOP LLC.  The product arrived in commercial packaging labeled only "MIRAMAR WALKING SHORT" with Style RAGB04757224AE0114.  The packaging contained no external Rag & Bone brand reference other than "MIRAMAR WALKING SHORT" — the label, invoice, and product identity all bore MIRAMAR as the source.  The internal "RAGB" prefix in the SKU code is the only Rag & Bone-related identifier on the packaging, but it is not visible to the consumer. This evidence demonstrates that (a) MIRAMAR is used as the primary brand name on physical product packaging, not as a "style name" or descriptor; (b) Defendants present MIRAMAR — not Rag & Bone — as the source of the goods to consumers receiving the packaged product; and (c) the conduct results in direct consumer confusion and false designation of origin under 15 U.S.C. § 1125(a).  Attached herewith as **Exhibit M** is a true and correct copy of photographs of the test-purchase packaging.

56.     The same "MIRAMAR-alone" source-identifier pattern occurs not only in the online channel but also in physical brick-and-mortar retail, including within MBG's home market of Orange County, California.  On February 21, 2026, an MBG representative made a verified in-store purchase at Defendant Evereve's retail location at 241 Newport Center Drive #611, Newport Beach, California 92660 (located in MBG's home market and within this District), at 11:38 a.m., consisting of three separate items, each labeled and rung up at the point of sale solely as "Miramar": (a) one "Miramar Terry Walking Short" (Scott/M, SKU 305958) at $108.00; (b) one "Miramar Terry Walking Short" (Morse/M, SKU 322505) at $108.00; and (c) one "Miramar Terry Track Pant" (Carst/M, SKU 314780) at $218.00 — for a pre-tax subtotal of $434.00 and a final consumer-paid total of $467.64.

57.     Critically, the consumer-facing transaction record — the customer receipt issued by Evereve at the point of sale — identifies each of these three different products by the single-word source designator "Miramar," with no reference to "Rag & Bone" appearing anywhere on the product designations.  This evidence directly refutes Defendants' litigation-induced position that "Miramar" functions only as a sub-collection style descriptor "locked up" with the Rag & Bone house mark in consumer-facing presentation.  To the contrary, in actual in-store retail commerce — at a tier-one retailer, in MBG's own home market, and with a consumer transaction value of nearly $500 — "Miramar" functions as the standalone source-identifier presented to and paid by the consumer.  Attached herewith as **Exhibit N** is a true and correct copy of the February 21, 2026 Evereve in-store purchase receipt.

58.     Defendant Evereve has gone further than passive resale.  Evereve has actively cultivated and monetized consumer confusion as an engagement strategy by deploying social-media content expressly designed to blur the source identity between Defendants' junior "Miramar" line and authentic denim.  On Evereve's

official, verified Instagram account, Evereve posted a video gameplay titled "Is it Miramar?" in which Evereve's home-office staff are challenged to guess which of two pairs of "jeans" are made of actual denim and which are the soft-terry "Miramar" product. Evereve's caption describes the gameplay as the "Miramar challenge" and concludes that "the Rag and Bone Miramar pants, printed to look like denim, DEFINITELY do" (referring to whether they look like jeans). The post surfaces on the Instagram platform in response to consumer searches for the generic apparel term "jeans," and the Instagram interface generates an algorithmic search-suggestion recommendation reading "rag and bone jeans miraar" [sic] — demonstrating that the platform's recommendation system has already absorbed the conflation of Defendants' junior "Miramar" use with the general "jeans" product category, all at MBG's expense. This is not incidental marketing — it is a Defendant retailer affirmatively and intentionally generating consumer-side confusion about whether a product is "Miramar" or denim, and routing that confusion into reverse-confusion harm against MBG's senior MIRAMAR® brand identity. Attached herewith as **Exhibit O** is a true and correct screen capture of Evereve's "Is it Miramar?" Instagram post.

59. Defendant Evereve's own e-commerce search infrastructure further confirms the deliberate, knowing nature of its participation in the infringement. A consumer search on Evereve's direct-to-consumer website at evereve.com using the query string "Miramar®" — that is, the term as it appears in MBG's federal registrations, including the registered-trademark symbol — returns the in-line header "10 results for 'Miramar®'" followed by the product-tile results "RAG AND BONE Miramar Jogger" offered for sale at $155. Evereve's use of MBG's federally-registered ® symbol in its own e-commerce search-results header constitutes (a) an admission that "Miramar" is a federally-registered trademark; (b) deliberate trafficking in the goodwill of that registered mark by mapping the registered-mark query directly to Rag & Bone products bearing the junior

"Miramar" designation; and (c) actionable use in commerce of the registered MIRAMAR® mark to advertise and offer for sale apparel goods, in violation of 15 U.S.C. § 1114(1)(a). Attached herewith as **Exhibit P** is a true and correct screen capture of the evereve.com search-results page for the query "Miramar®."

60.     The reverse-confusion harm to MBG is now visible at the level of Google's consumer-facing search results. On or about February 18, 2026, a Google search for "Miramar" returned a sequence of organic results in which Defendant Evereve's product page — titled "MIRAMAR WIDE LEG — Evereve" and describing the goods as "wide leg pants by rag & bone . . . crafted in their signature Miramar fabric" — appears interleaved directly between two of MBG's own first-party miramar.shop results, namely (a) MBG's primary commerce page titled "Miramar® | Quality Athleisure, Surf and Beachwear since 1983" appearing immediately above the Evereve result, and (b) MBG's "About Us — Miramar" page identifying MBG as "the original lifestyle house behind The Crown Marks™" appearing immediately below the Evereve result, followed by Rag & Bone's own rag-bone.com result. This direct-interleaving placement on Google — with Defendants' junior "Miramar" commercial offerings appearing sandwiched between MBG's senior brand pages on the first page of organic search results — is the precise visual signature of reverse confusion at the consumer-facing search-engine layer. Defendants' junior use has not merely intruded upon MBG's brand space; it has been promoted by the dominant consumer search platform to a co-equal position with MBG's own homepage and "About Us" page. Moreover, the Evereve description characterizes "Miramar" as a generic "fabric," thereby further diluting MBG's registered mark by re-presenting it to consumers as a material descriptor rather than a brand source-identifier. Attached herewith as **Exhibit Q** is a true and correct screen capture of the February 18, 2026 Google search-results sequence for the query "Miramar."

61.     The MIRAMAR commercialization on the Shopbop platform has further escalated into MBG's core commercial space.  As of May 2026, Amazon Shopbop search results display Rag & Bone "Miramar Swimwear" listings — directly competing with MBG's longstanding MIRAMAR®-branded swimwear and beach-lifestyle apparel covered expressly by MBG's '117 and '118 federal registrations, the first category of goods listed in the Class 25 specifications of those registrations.  Attached herewith as **Exhibit R** is a true and correct copy of the Amazon Shopbop search results.

62.     Between September 2 and September 10, 2025, MBG submitted twenty-one Amazon Brand Registry complaints covering 112 Rag & Bone MIRAMAR-titled ASINs.  Amazon accepted 87 listings for removal, designated 25 as under review, and rejected zero — a 100% acceptance rate.  The SKU families Amazon accepted as infringing MBG's marks include Miramar Mesh Top, Miramar Joggers, Men's Fit 4 Miramar Cotton Fleece Pants (12 separate ASINs), Miramar Terry Sofie Ankle Pants, Miramar Wide Leg Pants, Miramar Terry Sofie Wide Pants, Miramar Shea Relaxed Straight Jeans, Miramar Walking Shorts, Miramar Wide Leg Sweatpants, Miramar Wide Leg Track Pants, and Miramar Jogger Sweatpants.  Notwithstanding Amazon's removal of those listings, Rag & Bone thereafter restored and multiplied their Amazon MIRAMAR presence — rebuilding the very SKU families Amazon had removed — to approximately 57 MIRAMAR-titled listings generating approximately $608,669 per month in revenue, as documented in the January 24, 2026 report of independent e-commerce consultant M. Mehroz Iftekhar.  Annualized, that monthly figure reflects approximately $7.3 million in MIRAMAR-designated Amazon revenue per year since Defendants' 2025 adoption of the MIRAMAR brand designation.  Attached herewith as **Exhibits S-T** are true and correct copies of the Amazon Brand Registry Submission History and the Mehroz Report, respectively.

AMENDED COMPLAINT
Case No. 8:26-cv-00011-MRA-BFM

63. On January 1, 2026 — three months after the PTO's October 30, 2025 Section 2(d) refusal, four months after MBG's August 28, 2025 cease-and-desist letter, and one month after Rag & Bone obtained a TRO from a federal court in New York — Rag & Bone sent a mass marketing email to thousands of consumers (including MBG at kingofthebeach.com) titled "Ease Into the New Year."  The email's creative places "rag & bone / MIRAMAR" as a co-equal brand lockup overlaid on hero product imagery.  The email's product copy refers to the product line as "rbMiramar" — a coined neologism contracting Rag & Bone's house mark abbreviation with MIRAMAR.  The email's "Shop Now" and "Shop The Look" hotlinks route directly to www.rag-bone.com/womens-miramar/.  The email was delivered through Klaviyo email infrastructure with DKIM, SPF, and DMARC authentication from send.rag-bone.com — confirming the email is Rag & Bone's own authorized commercial outreach.  Attached herewith as **Exhibit U** is a true and correct copy of the email.

64. Ten days later, on January 11, 2026, Rag & Bone sent a second mass-marketing email continuing the same MIRAMAR campaign, this time using "Miramar" as a standalone source-identifier rather than in the "rag & bone / MIRAMAR" lockup form.  The email's subject line itself reads "Look Twice at New Miramar" — deploying "Miramar" alone as the brand in the consumer's inbox. The email's body repeatedly uses "Miramar" as a standalone product-line designator, including the calls-to-action "Shop New Miramar" and "Shop All Miramar," and identifies individual products solely by the "Miramar" name — including the "Miramar Logan Layered Wide-Leg Pants," the "Miramar Kaia Layered Shorts," the "Miramar Harlow Ankle Straight Pants," and the "Miramar Oversized Combo Trucker Jacket."  Each product hotlink routes directly to Rag & Bone's dedicated MIRAMAR storefront at www.rag-bone.com/womens-miramar/.

65. The email is fully self-authenticating: it was sent from "rag & bone" <help@rag-bone.com> to Mr. Ascher at stephen.ascher@kingofthebeach.com on

January 11, 2026, and the message headers reflect "PASS" results for SPF (IP 159.183.81.180), DKIM (domain send.rag-bone.com, selector s1), and DMARC (header.from=rag-bone.com) — conclusively confirming the email is Rag & Bone's own authorized commercial outreach.  The headers further confirm the email was transmitted through Rag & Bone's Klaviyo email-service infrastructure (bearing Klaviyo "X-Kmail-Account" and "X-Kmail-Message" identifiers, a manage.kmail-lists.com unsubscribe path, and a Klaviyo abuse-reporting address), sent via o3456.messaging.rag-bone.com.  This January 11, 2026 email — like the January 1, 2026 email — postdates the USPTO's October 30, 2025 Section 2(d) refusal, MBG's August 28, 2025 cease-and-desist letter, and the New York TRO, and confirms a sustained MIRAMAR mass-marketing campaign in January 2026.  Attached herewith as **Exhibit V** is a true and correct copy of the January 11, 2026 email.

66.     On October 27, 2025, MBG served a second formal cease-and-desist letter on WHP Global and Rag & Bone, addressed personally to CEO Yehuda R. Shmidman and Chief Commercial Officer Stanley Silverstein.  The letter was transmitted via Federal Express, Certified Mail, and e-mail, with copy to William A. DiBianca of the Polsinelli firm.  The letter set forth detailed factual and legal grounds for MBG's infringement claims and made five specific written demands: (a) immediately and permanently cease and desist all use, promotion, association, or activation of MIRAMAR for apparel goods in any commercial context; (b) remove all MIRAMAR references from retail partners, e-commerce, marketing, labels, packaging, store activations, and social media within three business days; (c) cease and desist from any manufacture, importation, advertising, distribution, or offering for sale of any products bearing the MIRAMAR trademark; (d) provide an accounting of all revenue derived from WHP/Rag & Bone's infringing use of MBG's MIRAMAR trademarks; and (e) expressly abandon the pending U.S. Application Serial No. 99/224,195 for "RAG & BONE / MIRAMAR."  Rather than complying

or even responding, on November 30, 2025, Rag & Bone filed a complaint and TRO in New York federal court.  Attached herewith as **Exhibit W** is a true and correct copy of the October 27, 2025 cease-and-desist letter.

67.     The MIRAMAR commercialization has extended into affiliate-commerce and broadcast-television channels through Defendant Couponology, Inc. On October 29, 2025, Couponology's Account Executive Eirini Denazi disclosed to MBG in writing that Couponology was running "a campaign on Rag & Bone's Miramar products" — specifically, that Couponology was "running an ABC TV Segment campaign currently, and the Meta Ads are part of the package."  Ms. Denazi represented that the campaigns had been "approved by the brand" — that is, by Rag & Bone.  On October 30, 2025, Mr. Ascher served written notice on Couponology of MBG's incontestable MIRAMAR registrations and the active infringement dispute, demanding that Couponology "remove any reference to Rag & Bone's Miramar products in any ad campaign including all metadata, keywords and alt text."  Couponology's Affiliate Performance Director Christopher Daskalis responded the same day to confirm that Couponology had "suspended our 'Miramar' focused Ads as per Meta" — that is, that the suspension was driven by Meta's brand-protection enforcement rather than Couponology's voluntary recognition of MBG's rights.  Attached herewith as **Exhibit X** is a true and correct copy of the October 29-30, 2025 correspondence.

68.     A WHP Global senior executive responsible for licensing has admitted in writing to MBG, in correspondence dated on or about September-October 2025, that (a) WHP Global does not own Rag & Bone fully and shares ownership with Defendant Guess?, Inc.; (b) the Miramar denim line predates WHP Global's 2024 acquisition of the Rag & Bone IP; and (c) WHP Global examined MBG's PTO trademark registrations and, on the basis of that examination, concluded — incorrectly — that MBG lacked rights in retail-store services beyond Class 25.  The WHP executive's written statements include that "we do not own Rag and bone

fully and we just own the [R]ag and bone IP . . . the creation of the Miramar denim is anterior to the acquisition" and "it doesn't look you own the right for retail/stores. Only class 25." These admissions establish that WHP Global deliberately examined MBG's coverage, identified what it perceived as a coverage gap in retail-store services, and proceeded to commercialize MIRAMAR in that perceived gap notwithstanding actual knowledge of MBG's Class 25 rights. The perceived coverage gap did not in fact exist, as explained hereinabove. Attached herewith as **Exhibit Y** is a true and correct copy of the WHP correspondence.

69.     On April 23, 2026, *The Wall Street Journal's* commerce vertical WSJ Buy Side — a Dow Jones property — published a paid commerce article titled "These Wide-Leg Jeans Are Secretly Sweatpants — And They're My Work-From-Home Must-Have." The article promotes the "Rag & Bone Miramar Wide-Leg Pants" at $198 with active commerce hotlinks routing consumers to ragandbone.com and Nordstrom.com. WSJ Buy Side discloses it earns commission on these hotlinks. The article does not mention MBG and does not disclose the PTO's rejection of the RAG & BONE / MIRAMAR trademark application. The article reaches tens of millions of subscribers. Attached herewith as **Exhibit Z** is a true and correct copy of the WSJ Buy Side article.

70.     The WSJ Buy Side article is particularly injurious because it does not consistently use the "Rag & Bone" house mark in combination with "Miramar" in the manner Defendants have asserted to other courts and to the PTO. To the contrary, the article repeatedly and prominently uses "Miramar" and the phrase "Miramar line" as a standalone brand identifier, untethered from any Rag & Bone house-mark lockup, including in the article's dedicated sub-section titled "More from the Miramar line" and the editorial statement that "The Miramar line includes several other styles for men, women and kids, including joggers." The article cross-promotes additional standalone "Miramar"-branded products including the "Sofie Ankle-Length Pants in the Miramar line." Dow Jones' deployment of "Miramar

line" as a standalone brand designator — in editorial copy reaching tens of millions of consumers and disclosed by WSJ Buy Side to generate affiliate-commission revenue from hotlinks to ragandbone.com and Nordstrom.com — confirms that "Miramar" now functions in mainstream consumer-press as a source-identifying mark in its own right, divorced from any Rag & Bone composite presentation.  The article's author also describes the product line by reference to multiple "Miramar"-only product names: the "Sofie Ankle-Length Pants in the Miramar line," standalone "joggers," and "shirts and jackets for a full undercover loungewear outfit."

71.    The WSJ Buy Side article is illustrative of an accelerating trajectory of marketplace penetration that makes the trademark injury here urgent and not adequately remediable through ordinary trademark-prosecution timelines.  The progression in the first half of 2026 alone — (a) the January 1, 2026 "rbMiramar" mass-marketing email, followed eleven days later by the January 11, 2026 "Look Twice at New Miramar" email using "Miramar" as a standalone brand, together constituting a sustained January 2026 mass-marketing campaign; (b) the February 18, 2026 Google search-results sequence in which Defendant Evereve's "MIRAMAR WIDE LEG" page appears interleaved between MBG's own miramar.shop homepage and "About Us" page on the first page of consumer search results; (c) the February 21, 2026 in-store retail sale at Defendant Evereve in MBG's home market using "Miramar" as the sole consumer-facing source designator on three different garment styles; (d) Defendant Evereve's ongoing "Is it Miramar?" Instagram engagement campaign actively soliciting consumer confusion between "Miramar" and authentic denim; (e) Defendant Evereve's use of MBG's federally-registered MIRAMAR® mark with the ® symbol as a search query in its own evereve.com e-commerce platform returning ten Rag & Bone product listings; (f) the April 2026 Meta third-party AI-commerce infrastructure launch incorporating Defendants' MIRAMAR campaign data into machine-readable retailer recommendation systems; and (g) the April 23, 2026 WSJ Buy Side Dow Jones

placement using "Miramar line" as an untethered brand designator — demonstrates that Defendants' conduct is not abating but accelerating into mainstream consumer-press channels, and that each day of continued infringement compounds consumer association of the "Miramar" mark with Defendants rather than with MBG.  This accelerating trajectory establishes the imminence of irreparable harm and the inadequacy of any post-trial monetary remedy.

72.     The same standalone-"Miramar" presentation, and the algorithmic propagation of the resulting confusion, appears in other mainstream consumer-press affiliate commerce.  An article published by Who What Wear (whowhatwear.com, a Future US, Inc. property) authored by fashion editor Sierra Mayhew — first published on or about May 2, 2025 and updated on or about September 11, 2025 — reviews the product line under the standalone heading "Miramar Terry Wide Leg Pants" and refers to additional "Miramar" styles, untethered from any Rag & Bone house-mark lockup, with affiliate-commission hotlinks routing consumers to ragandbone.com, Nordstrom.com, Shopbop, and Saks.  The article opens with the author's observation that her "algorithm knows [her] well" — illustrating how Defendants' junior "Miramar" use is propagated through social-media and search algorithms, compounding MBG's loss of control over its senior mark across digital channels.

73.     This action presents a classic case of reverse confusion, in which a powerful junior user (Rag & Bone) has adopted and promoted a mark (MIRAMAR) in a manner that overwhelms and displaces the commercial identity of a senior brand owner (MBG).  Rag & Bone is a New York-based fashion house that chose to use the MIRAMAR name willfully, without clearing the name and without acquiring any license or other rights to use MBG's already-existing, registered brands.  As a result of Rag & Bone's extensive marketing and online "saturation" beginning in mid-2025, consumers increasingly associate the name MIRAMAR with Rag & Bone rather than with MBG, the owner of the brand.

74.    Upon information and belief, Rag & Bone adopted MIRAMAR in 2025 as a collection and brand signifier to generate market momentum in core apparel categories, notwithstanding MBG's seniority and registered trademark rights.

75.    On June 9, 2025, Rag & Bone filed U.S. Trademark Application Serial No. 99224195 for the proposed trademark RAG & BONE / MIRAMAR.  Rag & Bone acknowledged that it had not yet used MIRAMAR as an asserted trademark; rather, it stated its "intent to use" the mark.  On October 30, 2025, the PTO rejected the application via a "Section 2(d) Refusal—Likelihood of Confusion" for many reasons, primarily based on MBG's '117 Registration and '118 Registration.  Attached herewith as **Exhibit AA** is a true and correct copy of the October 30, 2025 Office Action.  In the Office Action, the PTO made findings and conclusions including the following.

76.    As the PTO explained, "Trademark Act Section 2(d) bars registration of an applied-for mark that is so similar to a registered mark that it is likely consumers would be confused, mistaken, or deceived as to the commercial source of the goods and/or services of the parties.  *See* 15 U.S.C. §1052(d).  Likelihood of confusion is determined on a case-by-case basis by applying the factors set forth in *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 1361, 177 USPQ 563, 567 (C.C.P.A. 1973) (called the "*du Pont* factors"). . . .  Although not all *du Pont* factors may be relevant, there are generally two key considerations in any likelihood of confusion analysis: (1) the similarities between the compared marks and (2) the relatedness of the compared goods and/or services."

77.    Concerning the factor of "Similarity of the Marks," the PTO concluded: "In this case, both marks share the similar wording, MIRAMAR.  This similarity creates a confusingly similar commercial impression because consumers are likely to believe that registrant's mark is a condensed form of applicant's mark or that registrant has begun offering similar goods and services under another iteration of

its registered mark.  Thus, the addition of wording does not create a distinct commercial impression that distinguishes applicant's mark from registrant's mark."

78.     Concerning the factor of "Relatedness of the Goods and Services," the PTO concluded: "The attached Internet evidence establishes that the same entity commonly manufactures, produces, or provides the relevant goods and/or services and markets the goods and/or services under the same mark.  Thus, applicant's and registrant's goods and/or services are considered related for likelihood of confusion purposes. . . .  The marks create the same commercial impression and the attached evidence illustrates that the goods and services are commercially related and are likely to be encountered together in the marketplace by consumers.  Accordingly, consumers are likely to be confused and mistakenly believe that the products and services originate from a common source.  Therefore, registration must be refused."

79.     Rag & Bone requested an extension of time to respond to the substance of the Office Action, and then requested a suspension of the application to delay a final rejection.  Meanwhile, Rag & Bone has continued and expanded its MIRAMAR rollout notwithstanding MBG's August 28, 2025 cease-and-desist letter and the clear rejection of Rag & Bone's position by the PTO.  In an action filed recently in New York—*Rag & Bone Holdings, LLC et al. v. Miramar Brands Group, Inc.*, Case No. 1:25-cv-09937-LGS (S.D.N.Y)—Rag & Bone has asserted many allegations, including that "Rag & Bone at no time has committed trademark infringement [because] there is no reasonable argument that confusion is even likely."  Rag & Bone did not address the PTO's October 30, 2025 findings regarding likelihood of confusion, because no defense to those findings is plausible.

80.     In the New York action, Rag & Bone convinced the district court to enter a TRO and consider a preliminary injunction (which consideration is pending) preventing MBG from removing Rag & Bone's uses of MIRAMAR online, including particularly with Instagram and Amazon.  The TRO was issued on December 3, 2025, before any written response could be prepared and filed by

MBG, and on a limited ex parte record focused primarily on then-existing platform enforcement.

81.    On April 13, 2026, the New York court conducted a full evidentiary hearing at which Rag & Bone's Senior Vice President of Marketing testified that the Miramar collection is "a key collection within our product portfolio" and "a massive revenue driver for our brand," and MBG's principals and industry-veteran witnesses testified to actual confusion in the marketplace, as set forth herein.  The New York court is still considering briefing on the preliminary injunction issue.

82.    Importantly, the New York court has not yet decided a pending motion to dismiss the action for a lack of personal jurisdiction over MBG, which is a very small company located solely in Southern California.

83.    The Rag & Bone MIRAMAR product line "includes among other things, pants, shorts, shirts, dresses, and T-shirts," as admitted in its New York action.  Beginning in 2025, Rag & Bone expanded promotion of its infringing MIRAMAR line that has become popular with consumers, to the point that searches for "MIRAMAR clothing" prominently display Rag & Bone's MIRAMAR products in sponsored and paid search results ahead of MBG's products and official websites. Attached herewith as **Exhibit BB** are true and correct images of some of Rag & Bone's clothing items, which are sold online as well as in retail outlets including Amazon, Shopbop ($178.00 "Miramar One-Piece Swimsuit", $98.00 "Miramar String Bikini") Google, T.J. Maxx, and other places in competition with MBG's clothing items.  Rag & Bone's items are typically priced at premium levels; for example, sweatpants priced approximately $100-200.  The pricing overlaps directly with MBG's premium-tier pricing range of $32-650 across the MIRAMAR® apparel category, placing the parties' goods in the same commercial market and price band.

84.    The harm to MBG has further accelerated through recently-launched commerce infrastructure and machine-readable retailer systems.  In April 2026,

Meta launched infrastructure permitting third-party AI-assisted commerce systems to access advertiser campaign data, product catalogs, and audience signals — placing Rag & Bone's MIRAMAR campaigns inside the machine-readable systems that increasingly shape consumer-facing retailer recommendations. As of May 2026, the "rag & bone / Miramar" social-media advertising appears with market-saturation frequency on every Instagram account operated by MBG's California-resident principals, while MBG's own MIRAMAR® brand has largely disappeared from those same feeds.

85. Google AI-generated commerce summaries now identify "rb Miramar" as a "trademarked" Rag & Bone line — propagating the exact terminology Rag & Bone coined in their January 1, 2026 mass marketing email. The false association between MIRAMAR and Defendants is becoming embedded in the retailer-search systems, machine-readable commerce feeds, and digital infrastructure upon which MBG depends to preserve its senior rights.

86. The depth of this displacement is now evidenced at the AI-commerce-summary layer. As of May 2026, a Google search for "the miramar brand" returns a Google AI Overview whose entire structure is organized around Rag & Bone's infringing use — captioned "The Branding Confusion," "Key Legal Conflict," and "Summary of Differences." Google's AI Overview cites the actual confusion of MBG's Olympian co-founder Sinjin Smith as the lead illustration, stating that "Volleyball legend Sinjin Smith, long-time partner of the original Miramar®, noted that he and his wife initially assumed it was a legitimate partnership when they saw Rag & Bone's marketing." The AI Overview identifies MBG as the "Senior mark holder (since 1980s)" and Defendant Rag & Bone as a "Competitor (via legal dispute);" characterizes the dispute as one in which "a powerful junior brand (Rag & Bone) overwhelms the identity of a smaller senior brand that has owned the name since the 1980s;" and directs consumers seeking "the original Miramar®" to MBG's websites at miramar.shop and kingofthebeach.com — independently corroborating

MBG's continuous commercial use of miramarstores.com (forwarded to miramar.shop).

87. That an AI-generated brand summary at Google cannot describe "the miramar brand" without describing the dispute and Defendants' infringement confirms the reverse confusion at the level of consumer-facing brand identity. The harm so documented is embedded at the AI-infrastructure layer and is not readily reversible without firm judicial intervention. Attached herewith as **Exhibit CC** is a true and correct copy of the Google AI Overview for "the miramar brand."

88. The reverse-confusion harm caused by Defendants' junior "Miramar" commercialization has extended beyond the named Defendants and into the tier-one luxury department-store ecosystem operated by Saks Global Enterprises LLC and its affiliates Saks.com LLC, Neiman Marcus Group LLC, and Bergdorf Goodman, Inc. (collectively, the "Saks Global Entities"). The Saks Global Entities are not named as Defendants in this action because of the recent case *In re Saks Global Enterprises LLC, et al.*, Case No. 26-90103 (ARP) (Bankr. S.D. Tex.) (Jointly Administered) (the "Saks Global Bankruptcy"). MBG's decision not to name the Saks Global Entities herein is without prejudice to MBG's rights to assert claims against the Saks Global Entities and their successors-in-interest at the conclusion of the bankruptcy proceeding, including pursuant to any plan of reorganization, asset sale order under 11 U.S.C. § 363, or order modifying or lifting the automatic stay.

89. In November 2025, MBG transmitted an executive-level, cease-and-desist letter to the Chief Executive Officer of Saks Global Enterprises LLC, demanding that the Saks Global Entities cease all marketing, advertising, distribution, and sale of Defendants' junior "Miramar"-designated apparel on their e-commerce platforms, including Saks.com, Neimanmarcus.com, and Bergdorfgoodman.com. Notwithstanding receipt of that cease-and-desist letter, and notwithstanding the commencement of the Saks Global Bankruptcy on or about the petition date in 2026, the Saks Global Entities have continued and, upon information

and belief, accelerated their marketing, advertising, and sale of Defendants' junior "Miramar"-designated goods on a post-petition basis. Consumer searches on Saks.com, Neimanmarcus.com, and Bergdorfgoodman.com for the term "Miramar" continue to return Defendants' junior product listings, contributing directly to the reverse-confusion harm pleaded herein. This continued, post-cease-and-desist, post-petition conduct — in the face of known, federally-registered, incontestable trademark rights — is rationally explicable only if the Saks Global Entities have received (or believe they have received) third-party indemnification, defense, or hold-harmless undertakings from Defendants Rag & Bone Holdings, LLC, RB Topco Sagl, and/or WHP Global, LLC covering the infringement exposure they have incurred and continue to incur.

90.     In the Saks Global Bankruptcy, MBG has filed a proof of claim against the Debtors' estates in the amount of $125,000,000 on account of MBG's Lanham Act and related claims arising from the Saks Global Entities' pre-petition and continuing post-petition marketing, distribution, and sale of Defendants' junior "Miramar"-designated goods. MBG has further filed a Rule 3018(a) motion for temporary allowance of its claim for voting purposes and has propounded its First Set of Expedited Production Requests on Debtors Saks Global Enterprises LLC and Saks.com LLC seeking, among other things: (a) all gross sales data, net revenue reports, and ledger entries reflecting sales of the infringing goods on Saks.com, Neimanmarcus.com, and Bergdorfgoodman.com during the relevant period; (b) all vendor agreements, purchase orders, and distribution contracts between the Debtors and Defendants Rag & Bone Holdings, LLC, RB Topco Sagl, or WHP Global concerning the infringing goods; (c) all documents and communications relating to any vendor indemnification, defense obligations, or liability insurance coverage extended by Rag & Bone or WHP Global to the Debtors concerning trademark litigation or third-party brand enforcement by MBG; and (d) all internal and external

communications regarding the executive-level cease-and-desist notices transmitted by MBG to the Debtors' corporate officers.

91.     The existence and scope of any vendor indemnification, defense obligation, or hold-harmless undertaking by Defendants Rag & Bone Holdings, LLC, RB Topco Sagl, and/or WHP Global, LLC in favor of the Saks Global Entities or any other downstream retailer of the infringing "Miramar"-designated goods is material to this action because such an indemnification undertaking would establish that Defendants have (a) actual knowledge of the infringement exposure created by their commercialization of the junior "Miramar" designation; (b) acceptance of contractual responsibility to defend and hold harmless downstream commercial participants in the infringement; and (c) corresponding willfulness for purposes of enhanced damages under 15 U.S.C. § 1117(a).  Defendants have to date refused to produce the indemnification documents and have not voluntarily disclosed the existence or scope of any such undertakings.  MBG accordingly reserves the right to amend this Amended Complaint upon receipt of the indemnification documents and communications produced in the Saks Global Bankruptcy or otherwise, including without limitation to add as Defendants the Saks Global Entities upon any modification or termination of the automatic stay or upon consummation of a Section 363 sale to a successor-in-interest.

92.     As is predictable, there have also been several examples of actual confusion.  For example, several individuals including Mr. Theodore Jaffrey, Mr. Moses Khuu and Mr. Dale Waters have contacted MBG and asked about Rag & Bone's use of MBG's MIRAMAR® brand.  Attached herewith as **Exhibit DD** are true and correct copies of these communications.  Mr. Erik Nordstrom — a senior executive of Nordstrom with whom MBG has maintained a trusted retail relationship for decades — contacted Mr. Ascher directly around Thanksgiving 2025 to express confusion about Rag & Bone's use of MIRAMAR as a brand.

Defendants' own Senior Vice President of Marketing testified under oath that she was unaware of that contact.

93.     Rag & Bone's infringing use of MIRAMAR® and its ensuing efforts to mischaracterize lawful brand-registry enforcement have also caused reputational harm to MBG's long-standing commercial relationships.  For example, a senior executive of Nordstrom — a retail partner with whom MBG has maintained a trusted relationship for decades — contacted MBG directly to question why infringement issues had arisen at all, reflecting confusion and concern generated by Rag & Bone's conduct rather than any change in MBG's even-handed enforcement practices.  At the same time, searches for "Miramar" on major retail platforms, including Nordstrom.com and other retail partners, continued to surface Rag & Bone's MIRAMAR-branded products notwithstanding MBG's proper enforcement efforts.

94.     Particularly probative of actual confusion is that MBG's own Olympian co-founder, Christopher St. John "Sinjin" Smith, was himself initially confused by Defendants' junior MIRAMAR commercialization.  As independently reported in Google's AI-generated brand summary for "the miramar brand," Mr. Smith — the very person whom Google describes as "long-time partner of the original Miramar®" — and his wife "initially assumed it was a legitimate partnership when they saw Rag & Bone's marketing."  Confusion of MBG's own co-founder — an Olympic athlete and lifelong steward of the Crown Brands who would be the least likely consumer in the marketplace to be confused as to the source of MIRAMAR-designated apparel — is striking evidence of the reverse-confusion harm pleaded herein.  If even the senior brand's own co-founder, upon seeing Defendants' marketing, initially assumed it must reflect a partnership rather than infringement, the consumer-perception failure is severe and is occurring at the highest level of brand sophistication.

AMENDED COMPLAINT
Case No. 8:26-cv-00011-MRA-BFM

95.    This distortion of marketplace signals and strain on established business relationships constitutes irreparable harm to MBG's goodwill and reputation that cannot be remedied by monetary damages alone.  Through its reckless adoption and saturation use of MIRAMAR®, Rag & Bone has collapsed the integrity of MBG's long-standing brand relationships, including relationships that had remained stable and uncontested for decades prior to Rag & Bone's infringement.

96.    Rag & Bone's infringing use of MIRAMAR® has been amplified in reputable fashion and mainstream consumer press within the Hearst publishing ecosystem.  *ELLE Magazine* published a Black Friday feature highlighting Rag & Bone's "Miramar" sweatpant jeans collection as a shopping pick, without reference to MBG's senior and incontestable MIRAMAR® brand.  Attached herewith as **Exhibit EE** is a true and correct copy of this article.  This misattribution is particularly injurious because *ELLE Magazine* is owned by Hearst, a long-standing editorial and commercial partner within MBG's brand-and-licensing ecosystem.

97.    Even more striking, in a nationally distributed issue of *Oprah's Daily*—a Hearst publication—Rag & Bone's "MIRAMAR" jeans were selected and featured as an editorial shopping "pick," again without reference to MBG's senior MIRAMAR® brand.  Attached herewith at **Exhibit FF** is a true and correct copy of this article.

98.    These unpaid editorial placements underscore the immediacy and severity of the reverse-confusion harm:  Defendants' junior use is being amplified by reputable third parties, causing consumers to associate "MIRAMAR" with Rag & Bone rather than with MBG.  These examples further reflect marketplace exposure to Rag & Bone's MIRAMAR branding through trade-press and retail-media coverage and related marketplace displacement evidence.

99.    The Hearst editorial placements warrant particular emphasis because Hearst Corporation is not an arm's-length third-party observer of the MIRAMAR

brand — Hearst has been a direct, long-standing commercial partner of MBG for more than twenty years, including through the ELLE® and ELLE Decor® collaborations specifically anchored to MBG's MIRAMAR® brand and Crown Brands portfolio as alleged hereinabove.  The fact that two Hearst-owned editorial properties — ELLE Magazine and Oprah's Daily — have independently published editorial shopping features promoting Defendants' junior "Miramar" line, in each instance without any reference to MBG's senior MIRAMAR® brand, establishes that the reverse-confusion harm pleaded herein has metastasized to the point that even MBG's own twenty-year commercial partner's editorial institutions can no longer distinguish between MBG's senior, federally-registered MIRAMAR® brand and Defendants' junior "Miramar" commercialization.  This is consumer-perception failure at the trade-press layer by an institution paid to know the difference, and it is occurring within MBG's own commercial ecosystem.

100.   Based on the foregoing, MBG is the senior owner of its registered MIRAMAR® trademarks, having used the marks continuously for decades in connection with its California lifestyle apparel, sports, and global brand extensions. Defendant Rag & Bone, a national fashion retailer and marketer, knowingly and willfully adopted MIRAMAR as a collection name and brand signifier in 2025.  By saturating the market through national retail distribution, paid digital advertising, influencer campaigns, and algorithm-driven promotions, Rag & Bone has caused consumers to believe—incorrectly—that MBG's senior brand MIRAMAR® is affiliated with, derived from, or subordinate to Rag & Bone.

101.   The harm to MBG is already occurring and is accelerating, as confirmed by platform-level confusion across Amazon, Meta and Google, including search-engine displacement that has effectively erased MBG's MIRAMAR® brand identity online.  Specifically, in April 2026, Defendants' MIRAMAR campaign saturated Meta and Instagram at frequencies sufficient to appear on every Instagram account operated by MBG's California-resident principals.  The Wall Street

Journal's commerce vertical WSJ Buy Side published a paid commerce article on April 23, 2026 promoting "Rag & Bone's Miramar Wide-Leg Pants" to Dow Jones' mass subscriber base with active commerce hotlinks from the "Miramar Line" to ragandbone.com and Nordstrom.com.

102.   The harm has also reached in-store retail commerce within MBG's own home market: on February 21, 2026, Defendant Evereve sold three different "Miramar"-designated garments to an MBG representative at Evereve's Newport Beach, California location for $467.64 total — with each item rung up and presented to the consumer at the point of sale solely as "Miramar," with no "Rag & Bone" reference appearing in the consumer transaction record.  The harm has further extended into the consumer-facing search-engine layer: as captured on February 18, 2026, a Google search for "Miramar" returned Defendant Evereve's "MIRAMAR WIDE LEG" product page sandwiched directly between MBG's own miramar.shop homepage and MBG's "About Us" page on the first page of organic results — with the Evereve listing characterizing "Miramar" as a generic "fabric," further diluting MBG's registered mark by re-presenting it to consumers as a material descriptor rather than a brand source-identifier.

103.   Rag & Bone's Senior Vice President of Marketing testified under oath that the Miramar collection is "a key collection within our product portfolio" and "a massive revenue driver for our brand," further confirming the trademark infringement.  Rag & Bone's Chief Merchandising Design Officer, Jennie McCormick, testified that the Miramar collection generated "close to $60 million of net sales" in 2025.  Although McCormick claimed that the collection was "first introduced into 2013" and "sold … continuously since 2013," those claims are contradicted by Rag & Bone's own contemporaneous, verified Instagram record, and McCormick conceded on cross-examination that "Miramar" had only "been existing as a style name" and that it "never has existed as a [brand]."  The

$60,000,000 figure thus reflects junior, infringing use of a 2025 brand-level commercial adoption, not a thirteen-year-old brand.

## FIRST CLAIM FOR RELIEF

### (Trademark Infringement)

104.   MBG incorporates by this reference all of the allegations stated in the above paragraphs.

105.   Under 15 U.S.C. § 1114(1)(a) and § 1125(a), each Defendant is liable for infringement of MBG's MIRAMAR® trademarks, including but not limited to the '117 Registration and '118 Registration and unregistered trademark rights, because each Defendant has, without consent, used in commerce the name MIRAMAR in connection with the sale, offering for sale, distribution and/or advertising of its associated products, including as a false designation of origin, which use is likely to cause confusion, or to cause mistake, or to deceive consumers as to the source, sponsorship, or affiliation of the parties' competing products.

106.   The Ninth Circuit recognizes reverse confusion as an actionable theory of trademark infringement under the Lanham Act, applying the same multi-factor likelihood-of-confusion analysis articulated in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979), and recognizing the reverse-confusion variant first adopted in *Dreamwerks Production Group, Inc. v. SKG Studio*, 142 F.3d 1127 (9th Cir. 1998).  More recently, in *Ironhawk Technologies, Inc. v. Dropbox, Inc.*, 2 F.4th 1150 (9th Cir. 2021), the Ninth Circuit affirmed that the reverse-confusion doctrine applies with particular force where a larger, market-saturating junior user adopts a mark in commercial circumstances likely to cause consumers to believe the senior owner's goods originate with the junior user.  The *Sleekcraft* factors apply here, and each factor weighs in favor of finding Defendants' infringement.

107.   The first factor concerning a likelihood of confusion is the similarity of the marks.  As the Trademark Office has already determined, Rag & Bone's use of MIRAMAR is very similar, including because it "creates a confusingly similar

commercial impression because consumers are likely to believe that registrant's mark is a condensed form of applicant's mark or that registrant has begun offering similar goods and services under another iteration of its registered mark." This finding is corroborated by Rag & Bone's Senior Vice President of Marketing, who admitted in the September 5, 2025 WWD article that MIRAMAR drives "45 percent" of new women's customer acquisition and serves as a "bridge to the Rag & Bone brand" — confirming MIRAMAR's role as a dominant, source-identifying force within Rag & Bone's composite designation.

108. The second factor concerning a likelihood of confusion is the relatedness of the parties' goods. As the Trademark Office has already determined, "The marks create the same commercial impression and the attached evidence illustrates that the goods and services are commercially related and are likely to be encountered together in the marketplace by consumers. Accordingly, consumers are likely to be confused and mistakenly believe that the products and services originate from a common source." Both parties sell premium-tier Class 25 apparel at directly overlapping price points; for example, Defendants' MIRAMAR pants are priced from $150 to $225, within and overlapping MBG's premium-tier pricing range of $32–$650 across the MIRAMAR® apparel category.

109. The third factor concerning a likelihood of confusion is the marketing channels used by the parties. As referenced herein, the primary marketing channels for both parties are online channels including Google, Meta, TikTok and Amazon, driving search results for MIRAMAR to the consumer's point of purchase. Both parties also sell through major department-store and retailer channels, including Defendant Nordstrom — where Mr. Dale Waters first encountered Defendants' MIRAMAR products and assumed it was an MBG "collaboration." As the Trademark Office explained, the parties' products "are likely to be encountered together in the marketplace by consumers." The Ninth Circuit has long recognized that internet search and e-commerce platforms are critical marketing channels for

purposes of the likelihood-of-confusion analysis. *See Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036 (9th Cir. 1999); *Network Automation, Inc. v. Advanced Systems Concepts, Inc.*, 638 F.3d 1137 (9th Cir. 2011). The search-engine-layer evidence pleaded herein — including the Google AI Overview, the February 18, 2026 Google search-results sequence, and Defendant Evereve's use of MBG's registered MIRAMAR® mark as a search query string in its own e-commerce platform — demonstrates that Defendants' junior use has overtaken MBG's senior mark within precisely the marketing channels where consumers form purchasing decisions.

110. The fourth factor concerning a likelihood of confusion is the strength of the trademark at issue. As noted, MBG's MIRAMAR® trademarks are registered, and the registrations are incontestable. As such, the trademarks are presumed to represent, and do represent, strong trademark rights. MBG actively and continuously polices the MIRAMAR® mark, with approximately 1,400 successful Amazon takedowns across 22 storefronts between February 2024 and December 2025, and over 130 successful takedowns against TYR, Faherty Brand, and other third parties as recently as May 2026. In a reverse-confusion case such as this, the strength of the senior mark is further evaluated in light of the junior user's commercial saturation, which the record here establishes through (a) Defendants' $608,669 per month in Amazon revenue alone; (b) mainstream commerce media coverage in WSJ Buy Side and WWD; (c) market-saturation Instagram advertising; and (d) WHP Global's $8.5 billion retail platform.

111. The fifth factor concerning a likelihood of confusion is the intent behind the accused infringing use. While intent is sometimes difficult to ascertain directly, the circumstantial evidence allows an inference of intent, including the fact that Rag & Bone has proceeded willfully in adopting and using the name MIRAMAR in the face of not only MBG's conflicting trademark MIRAMAR® registrations, but the experts at the Trademark Office have specifically concluded

there is a likelihood of confusion.  Individual executives may be liable for trademark infringement as well, if "responsible for, participated in, directed, controlled, or ratified" the infringing acts, as trademark law directs.  Defendants' willful and knowing adoption of MIRAMAR is established by, among other things: (a) the express exclusion of MIRAMAR from the April 2, 2024 IP Assignment Agreement; (b) the June 9, 2025 intent-to-use trademark application, personally verified by WHP General Counsel Donnenfeld, notwithstanding MBG's incontestable registrations; (c) the continued and expanded MIRAMAR rollout after MBG's August 28, 2025 cease-and-desist letter; (d) the restoration of the exact SKU categories that Amazon removed in September 2025; (e) the January 1, 2026 "rbMiramar" mass-marketing email sent three months after the USPTO's Section 2(d) refusal; (f) the continued WSJ Buy Side commerce coverage and Instagram market-saturation through May 2026; (g) Defendant Evereve's use of MBG's federally-registered MIRAMAR® mark (including the ® registration symbol itself) as a search query string in its own e-commerce search infrastructure at evereve.com to direct consumers to Rag & Bone-sourced "Miramar" products — constituting an explicit acknowledgment that "Miramar" is a federally-registered mark and an admission of knowing exploitation of MBG's registration; (h) Defendant Evereve's "Is it Miramar?" Instagram engagement campaign actively soliciting consumer confusion between "Miramar" and authentic denim; (i) Defendants' continued retail sales of "Miramar"-only-labeled apparel through Evereve's physical store in MBG's own home market; and (j) the experts at the Trademark Office having specifically concluded — twice — that there is a likelihood of confusion.  Defendants' willfulness is further established by (k) the irreconcilable conflict between McCormick's sworn April 13, 2026 hearing testimony that the "Miramar collection" has been sold "continuously since 2013" and Rag & Bone's own contemporaneous, verified Instagram record showing the printed-fleece product was marketed as "THE SWEATPANT JEAN" (October 2023) and "rbSTRIDE" (November 2024) — not

"Miramar" — with "Miramar" first appearing only in or about May 2025; and (l) the January 11, 2026 "Look Twice at New Miramar" mass-marketing email deploying "Miramar" as a standalone source-identifier in the subject line and product names, sent two and one-half months after the USPTO's Section 2(d) refusal.

112. The sixth factor concerning a likelihood of confusion is any evidence of actual confusion. As referenced herein, reasonable consumers have been confused by Rag & Bone's use of the MIRAMAR name which was mistakenly believed to be associated with MBG's longstanding and distinctive MIRAMAR® brand.

113. The seventh factor concerning a likelihood of confusion is the likelihood of expansion into other markets. Because MBG's primary business model is licensing its brands, including MIRAMAR®, MBG is inherently likely to expand its MIRAMAR® brand into other new markets. MBG's existing and prospective licensing partnerships — including with Northaven Brand Holdings for sportswear and athleisure apparel and Magnum Holdings for activewear — depend on MBG's continued control over the MIRAMAR® mark in the apparel space. Defendants' commercialization directly forecloses MBG's expansion in the same markets.

114. The eighth factor concerning a likelihood of confusion is the degree of care likely to be exercised by purchasers. The parties' products are clothing primarily, which although not inexpensive, do not compel most consumers to exercise inordinate brand scrutiny to the extent needed to avoid a likelihood of confusion.

115. On information and belief, each Defendant has engaged in its infringing acts with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

116. On information and belief, each Defendant's trademark infringement has been willful, has resulted in and continues to result in unjust enrichment, and has injured MBG's business. Each Defendant's willful trademark infringement entitles

MBG to enhanced damages, including treble damages and disgorgement of Defendants' profits, under 15 U.S.C. § 1117(a).  Defendants' Amazon revenue alone from MIRAMAR-titled listings is approximately $608,669 per month, with cumulative revenue between 2023 and 2026 estimated at $20-25 million from Amazon alone, and total 2025 MIRAMAR sales of $60 million or more.

117.   MBG also has suffered and continues to suffer irreparable injury, including damage to customer relationships because of each Defendant's trademark infringement.  Such irreparable injury cannot be remedied adequately unless each Defendant is enjoined immediately from further infringement and commanded to rectify the status quo ante.

118.   MBG is entitled to a rebuttable presumption of irreparable harm upon a showing of likelihood of success on the merits (15 U.S.C. § 1116(a)).  The loss of control over the MIRAMAR® marks' identity and goodwill, including consumer confusion and marketplace displacement described above, is not readily quantifiable and constitutes irreparable harm.  *See Herb Reed Enterprises, LLC v. Florida Entertainment Management, Inc.*, 736 F.3d 1239 (9th Cir. 2013) (loss of control over reputation and goodwill supports finding of irreparable harm in trademark cases).

## SECOND CLAIM FOR RELIEF

### (False Designation of Origin)

119.   MBG incorporates by this reference all of the allegations stated in the above paragraphs.

120.   Under 15 U.S.C. § 1125(a), each Defendant is liable for infringement of MBG's MIRAMAR trademarks to the extent not registered, including as used in commerce for products and services not specifically depicted and/or listed in the '117 Registration, the '118 Registration, or other registrations owned by MBG. Each Defendant has falsely designated origin by, without consent, using in commerce the name MIRAMAR in connection with the sale, offering for sale,

distribution and/or advertising of its associated products, which use is likely to cause confusion, or to cause mistake, or to deceive consumers as to the source, sponsorship, or affiliation of the parties' competing products.

121.   On information and belief, each Defendant has engaged in its acts of false designation of origin with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

122.   On information and belief, each Defendant's false designation of origin has been willful, has resulted in and continues to result in unjust enrichment, and has injured MBG's business.  This entitles MBG to enhanced damages, including treble damages and disgorgement of Defendants' profits, under 15 U.S.C. § 1117(a). Defendants' Amazon revenue alone from MIRAMAR-titled listings is approximately $608,669 per month, with cumulative revenue between 2023 and 2026 estimated at $20-25 million from Amazon alone, and total 2025 MIRAMAR sales of $60 million or more.

123.   MBG also has suffered and continues to suffer irreparable injury, including damage to customer relationships because of each Defendant's false designation of origin.  Such irreparable injury cannot be remedied adequately unless each Defendant is enjoined immediately from further false designation of origin and commanded to rectify the status quo ante.

124.   MBG is entitled to a rebuttable presumption of irreparable harm upon a showing of likelihood of success on the merits (15 U.S.C. § 1116(a)).  The loss of control over the MIRAMAR marks' identity and goodwill, including consumer confusion and marketplace displacement described above, is not readily quantifiable and constitutes irreparable harm.

## THIRD CLAIM FOR RELIEF

### (Unfair Competition)

125.   MBG incorporates by this reference all of the allegations stated in the above paragraphs.

AMENDED COMPLAINT
Case No. 8:26-cv-00011-MRA-BFM

126.   By its acts alleged herein, each Defendant has knowingly engaged in unfair acts or practices and unfair methods of competition, including but not limited to making misrepresentations about its products, and otherwise engaging in deceptive trade practices and unlawful, unfair or fraudulent business acts or practices, in violation of Cal. Bus. & Prof. Code § 17200.  Under California Business and Professions Code § 17203, MBG seeks restitution and injunctive relief, not monetary damages, for this Second Claim for Relief.

127.   Each Defendant's unfair competition has resulted in and continues to result in unjust enrichment and was undertaken willfully to injure MBG's business.

128.   MBG also has suffered and continues to suffer irreparable injury, including damage to customer relationships because of each Defendant's unfair competition.  Such irreparable injury cannot be remedied adequately unless each Defendant is enjoined immediately from further unfair competition, and commanded to rectify the status quo ante.

## PRAYER FOR RELIEF

Therefore, Plaintiff MBG prays for the following relief:

A.   A determination that each Defendant has infringed one or more of MBG's registered trademarks;

B.   A determination that each Defendant has infringed one or more of MBG's unregistered trademarks as a false designation of origin;

C.   A determination that each Defendant has engaged in unfair competition in violation of Cal. Bus. & Prof. Code § 17200;

D.   An accounting for damages adequate to compensate for each Defendant's trademark infringement and/or unfair competition, including each Defendant's profits, any damages sustained by MBG, and the costs of the action, including under 15 U.S.C. § 1117(a), and including increased and/or treble damages;

-49-

E.     Equitable relief including a preliminary and permanent injunction prohibiting further unlawful actions, including mandating corrective advertising and abandonment of conflicting trademark applications;

F.     A determination that this is an exceptional case, and an award of costs, expenses and attorney fees to MBG;

G.     Pre-judgment and post-judgment interest on such monetary relief; and

H.     Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b) and L.R. (C.D. Cal.) 38-1, Plaintiff hereby demand a jury trial on all the issues so triable in this action.

Respectfully submitted,

Dated:  June 8, 2026                    **SML AVVOCATI P.C.**

By:     /s/ Stephen M. Lobbin
          Attorneys for Plaintiff

## VERIFICATION

I am President of Plaintiff Miramar Brands Group, Inc. I have personal knowledge of the matters set forth in the foregoing First Amended Complaint, except those matters expressly alleged on information and belief, and as to those matters, I am informed and believe them to be true. Pursuant to 28 U.S.C. § 1746, I declare and verify under penalty of perjury under the laws of the United States of America that the foregoing factual allegations are true and correct, except those allegations made on information and belief, which I believe to be true and correct.

Dated: May 30, 2026                    By: _____

## CERTIFICATE OF SERVICE

I hereby certify that on June 8, 2026, I electronically transmitted the foregoing document using the CM/ECF system for filing, which will transmit the document electronically to all registered participants as identified on the Notice of Electronic Filing, and paper copies have been served on those indicated as non-registered participants.

/s/ Stephen M. Lobbin