David Halberstadter (CA 107033)
david.halberstadter@katten.com
Kristin J. Achterhof (admitted *pro hac vice*)
kristin.achterhof@katten.com
Mark T. Ciani (admitted *pro hac vice*)
mark.ciani@katten.com
KATTEN MUCHIN ROSENMAN LLP
2121 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: +1.310.788.4408
Facsimile: +1.310.788.4471

*Attorneys for Defendant Rag & Bone Holdings, LLC*

Katten
Katten Muchin Rosenman LLP
2121 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067-5010
+1.310.788.4400 tel +1.310.788.4471 fax

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

Miramar Brands Group, Inc.,

Plaintiff,

v.

Rag & Bone Holdings, LLC, Guess?, Inc., WHP Global, LLC, Bloomingdale's, LLC, Nordstrom, Inc., Evereve, Inc., Revolve Group, Inc., URBN US Retail, LLC, BOP LLC, Rue Gilt Groupe, Inc.,

Defendants.

Case No. 8:26-cv-00011

Hon. Mónica Ramírez Almadani

**DEFENDANT RAG & BONE HOLDINGS, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Date: July 28, 2026
Time: 10:00 AM
Place: Courtroom 9B

# TABLE OF CONTENTS

Table of Authorities ........ ii
Introduction ........ 1
Background ........ 3
A. Rag & Bone's Miramar Collection Introduced in 2013 ........ 3
B. Rag & Bone's Sale, Marketing, and Advertising of the Miramar Collection ........ 4
C. MBG and its Brand Management Business ........ 5
D. MBG's Weak MIRAMAR Trademark ........ 6
E. MBG's Shakedown Campaign ........ 7
F. No Impact on MBG's Business ........ 9
G. The First-Filed SDNY Action ........ 11
Legal Standard ........ 12
Argument ........ 13
I. MBG Is Not Likely to Succeed on the Merits of Any of Its Claims ........ 13
A. There Is No Likelihood of Consumer Confusion ........ 13
B. Laches Bars MBG's Claims ........ 20
II. MBG Fails to Show Irreparable Harm ........ 21
III. The Balance of the Equities Strongly Favors Rag & Bone ........ 23
IV. Public Interest Weighs Against Granting an Injunction ........ 23
Conclusion ........ 24
Certificate of Compliance ........ 25

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Abercrombie & Fitch Co. v. Moose Creek, Inc.*,
No. CV-06-6245-AHM(SSX), 2007 WL 4973852
(C.D. Cal. Aug. 17, 2007) ......................................................16

*AMF Inc. v. Sleekcraft Boats*,
599 F.2d 341 (9th Cir. 1979)......................................................16

*Apartment Ass'n of Los Angeles Cnty., Inc. v. City of Los Angeles*,
10 F.4th 905 (9th Cir. 2021)........................................... 12, 13, 15

*Aurora World, Inc. v. Ty Inc.*,
719 F.Supp.2d 1115 (C.D. Cal. 2009) ......................................23

*Billfloat Inc. v. Collins Cash Inc.*,
No. 20-CV-09325-EMC, 2022 WL 2158970
(N.D. Cal. June 15, 2022) ......................................................19

*Blue Bottle Coffee, LLC v. Liao*,
No. 21-CV-06083-CRB, 2024 WL 2061259
(N.D. Cal. May 7, 2024) ........................................................13

*Bosley Med. Inst., Inc. v. Kremer*,
403 F.3d 672 (9th Cir. 2005)

*Cal. Power Athletes, Inc. v. Cali Power Inc.*,
No. 8:25- CV-02224-DOC-KES, 2025 WL 3691843
(C.D. Cal. Dec. 2, 2025) ........................................................22

*City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*,
944 F.3d 773 (9th Cir. 2019)......................................................23

*Contender Partners, LLC v. Azteca Int'l Corp.*,
No. CV-08-02026-MMM (JTLX), 2008 WL 11334492
(C.D. Cal. May 19, 2008)........................................................18

*Diamond Sands Apartments, LLC v. Clark Cnty. Nev.*,
164 F.4th 759 (9th Cir. 2026) .......... 12
*Doctor's Best Inc. v. Nature's Way Prods., LLC*,
No. 23-CV-0766-KK-KES, 2024 WL 1866134
(C.D. Cal. Mar. 29, 2024), *aff'd*, 143 F.4th 1101 (9th Cir. 2025) .......... 13
*Earth Island Inst. v. Carlton*,
626 F.3d 462 (9th Cir. 2010) .......... 12
*E-Sys., Inc. v. Monitek, Inc.*,
720 F.2d 604 (9th Cir. 1983) .......... 21
*Fizz Soc. Corp. v. Maplebear, Inc.*,
791 F.Supp.3d 990 (N.D. Cal. 2025) .......... 24
*Forschner Group, Inc. v. Arrow Trading Co., Inc.*,
30 F.3d 348 (2d Cir. 1994) .......... 14
*Grupo Gigante SA De CV v. Dallo & Co.*,
391 F.3d 1088 (9th Cir. 2004) .......... 21
*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*,
736 F.3d 1239 (9th Cir. 2013) .......... 22
*Icebreaker Ltd. v. Gilmar S.P.A.*,
911 F.Supp.2d 1099 (D. Or. 2012) .......... 16
*Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*,
4 F.3d 819 (9th Cir. 1993) .......... 23
*Jada Toys, Inc. v. Mattel, Inc.*,
518 F.3d 628 (9th Cir. 2008) .......... 17
*JL Beverage Co., LLC v. Jim Beam Brands Co.*,
828 F.3d 1098 (9th Cir. 2016) .......... 13, 14

*JMAS Enters., Inc. v. Kassir Imp.-Exp. Co.*,
No. 11-CV- 06258-SVW-PJW, 2011 WL 13221007
(C.D. Cal. Aug. 24, 2011) ........................................................................13

*Legator v. Nordstrom, Inc.*,
No. CV 11-4136-PA(EX), 2011 WL 13220707
(C.D. Cal. Dec. 29, 2011) ........................................................................19

*M2 Software, Inc. v. Madacy Ent.*,
421 F.3d 1073 (9th Cir. 2005)..................................................................20

*Marketquest Grp., Inc. v. BIC Corp.*,
862 F.3d 927 (9th Cir. 2017)....................................................................19

*Matrix Motor Co., v. Toyota Jidosha Kabushiki Kaisha*,
290 F.Supp.2d 1083 (C.D. Cal. 2003) ............................................15, 16

*Mattel, Inc. v. MGA Ent., Inc.*,
782 F.Supp.2d 911 (C.D. Cal. 2011) .......................................................15

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
638 F.3d 1137 (9th Cir. 2011)........................................... 15, 16, 18, 19

*Norm Thompson Outfitters, Inc. v. Gen. Motors Corp.*,
448 F.2d 1293 (9th Cir. 1971)..................................................................17

*Official Airline Guides, Inc. v. Goss*,
6 F.3d 1385 (9th Cir. 1993)......................................................................16

*Pinkette Clothing, Inc. v. Cosm. Warriors Ltd.*,
894 F.3d 1015 (9th Cir. 2018)...........................................................20, 21

*Pom Wonderful LLC v. Hubbard*,
775 F.3d 1118 (9th Cir. 2014)..................................................................18

*Premier Nutrition, Inc. v. Organic Food Bar, Inc.*,
475 F.Supp.2d 995 (C.D. Cal. 2007) .......................................................22

*Ramirez v. Martinez*,
No. 5:17-cv-02211-FMO-DTB, 2018 WL 4846795
(C.D. Cal. June 18, 2018)....................22, 23
*S10 Ent. & Media LLC v. Samsung Elecs. Co.*,
No. 2:21-CV-02443-CAS-JPRX, 2023 WL 2090703
(C.D. Cal. Feb. 14, 2023)....................17, 18
*Sand Hill Advisors, LLC v. Sand Hill Advisors, LLC*,
680 F.Supp.2d 1107 (N.D. Cal. 2010)....................14
*Self–Realization Fellowship Church v. Ananda Church of Self–Realization*,
59 F.3d 902 (9th Cir. 1995)....................17
*Tillamook Country Smoker, Inc. v. Tillamook Cty. Creamery Ass'n*,
465 F.3d 1102 (9th Cir. 2006)....................20
*VenVest Ballard, Inc. v. Clockwork, Inc.*,
No. ED-CV-1400195-MWF(EX), 2015 WL 12745801
(C.D. Cal. Feb. 11, 2015).................... 15, 16, 17
*Visa Int'l Serv. Ass'n v. E. Fin. Fed. Credit Union*,
967 F.2d 596, 1992 WL 138231 (Table) (9th Cir. 1992)....................14, 15
*Walter v. Mattel, Inc.*,
210 F.3d 1108 (9th Cir. 2000)....................17, 18

**Statutes:**

Cal. Bus. & Prof. Code § 17208....................20

## INTRODUCTION

Plaintiff Miramar Brands Group, Inc. ("MBG") asks this Court to issue extraordinary injunctive relief at odds with an existing Temporary Restraining Order entered by the United States District Court for the Southern District of New York ("SDNY") and a pending Motion for Preliminary Injunction the parties fully litigated and submitted months ago following a day-long evidentiary hearing. In all events, such relief is plainly unwarranted because MBG cannot prevail on the merits and has made no colorable showing of harm, irreparable or otherwise.

This Court is not the first to exercise jurisdiction over this dispute. Months before MBG filed this duplicative action, Rag & Bone Holdings, LLC ("Rag & Bone") commenced an action in the SDNY after MBG launched a campaign to interfere with Rag & Bone's longstanding use of the name "Miramar" by claiming trademark infringement, targeting Rag & Bone's advertisers, business partners, and investors, and disrupting its ability to market and sell its products. Finding "[s]erious questions concerning whether MBG has a valid trademark infringement claim" and that "the balance of hardships decidedly favors Plaintiffs," the SDNY court entered a TRO prohibiting MBG from interfering with Rag & Bone's use of the "Miramar" name and its ability to promote and sell the Rag & Bone Miramar Collection (the "Collection"). That order remains in effect.

The SDNY court has since conducted a full evidentiary hearing on Rag & Bone's Motion for Preliminary Injunction, received extensive post-hearing briefing, and taken the matter under submission. Rather than await the SDNY's ruling regarding the same matters MBG raises in this case, MBG filed this second action and now asks this Court to issue relief that would prohibit the very conduct the SDNY has already protected. In practical effect, MBG asks this

Court to override the status quo established by the SDNY and grant relief that would nullify that court's existing order.

As established in Rag & Bone's Motion to Stay, principles of federal comity, judicial economy, and the first-to-file rule exist to prevent precisely this situation—two federal courts simultaneously being asked to issue competing injunctions governing the same parties and the same conduct. MBG's Motion fails for this reason alone.

Even if the Court reaches the merits, MBG cannot satisfy any of the requirements for preliminary injunctive relief.

For more than thirteen years, Rag & Bone has continuously marketed and sold the Collection under the "Miramar" name. During that time, it has become Rag & Bone's flagship product line, generating substantial sales, widespread national media attention, and significant consumer recognition. Throughout its thirteen-year history, the "Miramar" name has been used in conjunction—and almost invariably in lock-up—with the Rag & Bone house mark, unmistakably identifying the Collection as originating from Rag & Bone.

Despite that longstanding, highly public use, MBG waited years before asserting its claims, and nearly a year after first accusing Rag & Bone of infringement before seeking injunctive relief. During that period, MBG litigated the preliminary injunction proceedings in the SDNY with no apparent sense of urgency—it sought and obtained a 40-day extension of the briefing schedule, **thereby extending the TRO's duration**, and waited until February 2026 to contest personal jurisdiction. Its delay alone is irreconcilable with any claim of imminent irreparable harm.

Nor can MBG demonstrate a likelihood of success on the merits. Its claims are barred by laches, and the record developed during expedited discovery and the evidentiary hearing in the SDNY confirms there is no meaningful likelihood

of consumer confusion between the parties' fundamentally different products and businesses. Indeed, after thirteen years of concurrent use, MBG has failed to identify meaningful evidence of actual consumer confusion.

The balance of equities and the public interest likewise weigh decisively against relief. MBG has shown no irreparable harm. By contrast, granting MBG's Motion would force Rag & Bone to abandon the name under which it has built substantial goodwill over more than a decade, disrupt its flagship product line, and create the untenable circumstance of two federal courts issuing inconsistent injunctions governing the same dispute. MBG's Motion should be denied.

## BACKGROUND[1]

### A. Rag & Bone's Miramar Collection Introduced in 2013

Rag & Bone is a "high-end contemporary clothing retailer" that designs, distributes, and sells high-quality apparel and accessories under its brand name RAG & BONE®. (Tr. 21:11-12, 70:15-21; Ciani Decl., Ex. B ¶3.) Since it was founded 23 years ago, Rag & Bone has grown from $2-5 million in annual net sales to approximately $400 million in annual net sales in 2025. (Tr. 22:5-16.)

Rag & Bone's most popular product line is its Rag & Bone Miramar Collection, which uses a *trompe l'oeil* printing technique to simulate denim and other designs like cable knits on various soft fabrics. (*Id*. 23:2-10, 32:4-5, 32:17-23, 51:21-52:12, 71:6-9; Ciani Decl., Ex. C at 6-21.) The word "Miramar" is the name of Rag & Bone's collection of products made with that printing technique. (Tr. 32:17-25, 71:16-21, 89:16-21.) Most items in the Collection are priced at

[1] "Ex." refers to exhibits attached to the Declaration of Mark T. Ciani ("Ciani Decl."). "Tr." refers to the transcript of the hearing held April 13, 2026, in *Rag & Bone Holdings, LLC v. Miramar Brands Group, Inc.*, No.1:25-cv-09937 (S.D.N.Y.) (the "SDNY Action"). (*See* Ciani Decl., Ex. A.) Filings in this action are identified as "Dkt." Filings in the SDNY Action not otherwise attached to the Ciani Declaration are identified as "SDNY Dkt."

$200-240, reflecting the premium quality of the products. (*Id*. 25:16-27:10, 28:16-29:3; Ciani Decl., Ex. C at 6-21.) The approximate age of the core customers for the Collection is 55 years old. (Tr. 30:22-32:3; Ciani Decl., Ex. D.)

Introduced by Rag & Bone in 2013, the Collection has been continuously sold under the name "Miramar" and has enjoyed overwhelmingly favorable reception from consumers and the press. (Tr. 33:1-3, 14-15, 35:18-38:23; Ciani Decl., Exs. E, F at 2, 21, 30, 46, 55, 78-87.) It received significant attention when introduced, and the Collection's profile has only grown over time, achieving millions of dollars in net sales in recent years and approximately $60 million net sales in 2025—about 15% of Rag & Bone's annual revenue. (Tr. 32:6-16, 25:18-36:1.) In 2024, the Collection was featured in (among other places) the *New York Times* and the *Wall Street Journal*, and Rag & Bone produced 200,000 units generating millions in net sales. (*Id*. 36:4-38:14, 32:8-13, 47:20-24; Ciani Decl., Ex. E at 47-88.) While Rag & Bone has expanded its *offerings* in the Collection over time, the *nature* of the products has not changed. (Tr. 34:1-7.) It still offers the Collection's signature sweatpant jean introduced in 2013. (*Id*. 33:4-10; Ciani Decl., Ex. C at 6-21.)

### B. Rag & Bone's Sale, Marketing, and Advertising of the Miramar Collection

The Collection is sold on Rag & Bone's website and in dozens of Rag & Bone retail stores across the country. (Tr. 27:11-15, 34:12-16; Ciani Decl., Ex. C.) Rag & Bone also sells its products to, and through, high-end retailers like Nordstrom, Inc. ("Nordstrom") and Saks Fifth Avenue ("Saks"). (Tr. 34:12-20; Ciani Decl., Ex. G.)

Rag & Bone promotes and advertises the Collection through social media platforms and has since 2017. (Tr. 35:5-12, 71:10-15, 76:9-19.) Advertising the

Collection directly to customers on Meta platforms Facebook and Instagram is a key component of Rag & Bone's e-commerce strategy. (Tr. 76:24-77:3; Ciani Decl., Ex. B ¶¶10-11.)

Rag & Bone consistently uses the terms "Rag & Bone" and "Miramar" in close proximity and almost always together (in direct "lock-up") when promoting or selling the Collection to ensure the Collection is always associated with the Rag & Bone house brand. (Tr. 71:16-72:21.) Although Rag & Bone may at times use the word "Miramar" by itself in Rag & Bone stores or on its website, it is clearly associated with Rag & Bone in those contexts. (*Id*. 59:4-60:3, 96:20-97:10.)

Rag & Bone has invested substantial resources into the success of the Collection, spending roughly $7.7 million in marketing since 2020. (*Id*. 75:17-19.) Although Rag & Bone has increased the advertising budget for the Collection since 2025, it continues to advertise in the same ways it has for years. (*Id*. 72:22-73:1, 75:20-76:4.) The only notable addition to its marketing efforts was opening three temporary "Rag & Bone | Miramar" pop-up stores in 2025 in New York, New Jersey, and Colorado, none of which continue to operate under that name. (*Id*. 67:10-17; 73:23-74:6.)

### C. MBG and its Brand Management Business

Founded on Miramar Beach, California, MBG is an "intellectual property holding and brand-licensing company." (Dkt. 23-2 ¶2; Tr. 132:6-21, 157:16-19.) MBG's business is split into two primary segments: managing third-party brands like ELLE (Am. Compl. ¶21; Tr. 132:6-12; Dkt. 23-2 ¶5); and managing, sponsoring, and participating in athletic events, specifically volleyball. (Tr. 112:21-113:10.) MBG also manages its own brands, all heavily associated with volleyball, which it collectively calls the "Crown Brands." That includes "MIRAMAR." (Am. Compl. ¶¶20, 22.)

MBG's "Miramar" trademark appears "on signage and on most clothing worn in connection with ... beach volleyball events and tours and related activations[.]" (*Id*. ¶22.) MBG also sells coastal-inspired "Quality Surf and Beachwear" products, including volleyballs and other athletic equipment and casual beachwear apparel. (Ciani Decl., Exs. H, I; Tr. 128:11-12, 185:14-186:24, 187:18-22.) According to MBG, its Miramar products are "brought to you from the shores of America's Riviera," and will "make your beach lifestyle amazing." (Ciani Decl., Ex. J at 1, 6, Ex. I at 5.) Of its more than 130 offerings, MBG's Miramar brand offers only four denim items, three of which are hats that say "Miramar." (Tr. 189:12-20; Ciani Decl., Ex. I.) Indeed, MBG's so-called "Denim Collection"—promoted as such for the first time in late 2025—consists primarily of non-denim t-shirts, hoodies, and two volleyballs. (*See* Dkt. 22-1 at 34.)

MBG's Miramar products, on the whole, are nothing like Rag & Bone's unique, *trompe l'oeil* Miramar Collection. Not only is the apparel itself categorically different, MBG's apparel is offered at lower price points to "cater to 25-35 year old athleisure and sports enthusiasts" (Am. Compl. ¶22), as opposed to Rag & Bone's core female customers who are around 55 years old (Tr. 30:22-25). MBG also sells its Miramar products in different retail spaces than Rag & Bone. It sells its apparel through its own website and on Amazon, TikTok, and Meta. (Dkt. 23-2 ¶13.) MBG does not sell any apparel at high-end department stores or boutiques. (Tr. 35:1-4.) Rag & Bone and MBG are not competitors. (*Id.*)

**D. MBG's Weak MIRAMAR Trademark**

MBG owns the MIRAMAR trademark in Class 25 for apparel. (Dkts. 22-2, 22-3.) Although it acknowledges it is obliged to police its Miramar mark (Tr.

150:16-21), it has not—at least not until its recent, highly selective, all-out effort against Rag & Bone.

During the April 13, 2026 SDNY hearing, the court was presented with evidence showing that multiple fashion brands openly and widely use the word "Miramar" as a designation for apparel products. (Ciani Decl., Ex. K.) MBG's principal, Stephen Ascher, testified that MBG had never engaged in enforcement efforts against these companies. (Tr. 165:13-170:2.)

Furthermore, MBG is not the only party who has a trademark registration incorporating the word MIRAMAR in Class 25 for apparel. Caruso Property Management, Inc. ("Caruso") owns registrations for MIRAMAR CLUB®, MIRAMAR BEACH®, and MIRAMAR EXPRESS®, all covering apparel products. (Ciani Decl., Ex. L.) Moreover, in a 2024 agreement, Ascher *consented to* "Caruso's use of MIRAMAR or any MIRAMAR formative mark in Class 25 ...." (Ciani Decl., Ex. M ¶ A.1.) The plain text of the Caruso agreement contains no restriction whatsoever on Caruso's use of the Miramar mark for apparel, although MBG—without any basis at all—has denied this. (*See generally id.*)

**E. MBG's Shakedown Campaign**

After more than 13 years of Rag & Bone's widely publicized use of the word "Miramar" for the Collection, and with *zero* evidence of consumer confusion (Tr. 189:25-190:4), MBG sent Rag & Bone a letter on August 28, 2025, claiming that the Collection constituted an unauthorized use of MBG's trademark and was likely to cause consumer confusion. (Ciani Decl., Ex. N.) MBG demanded, among other things, that Rag & Bone stop all use of the name "Miramar" and invited Rag & Bone to "discuss a potential trademark license." (*Id.*; Am. Compl. ¶43.) Rag & Bone's counsel responded on September 9, 2025,

rejecting MBG's demands and declining the invitation to enter into a licensing arrangement. (Ciani Decl., Ex. O.)

Although it now says it was suffering irreparable harm, MBG did not seek judicial relief. Instead, MBG began a campaign to pressure Rag & Bone into an unreasonable business arrangement. Ultimately, on November 11, 2025, MBG proposed that it would drop its demands in exchange for Rag & Bone's agreement to enter into a licensing deal whereby MBG would license the MIRAMAR® mark to Rag & Bone for $10 million upfront, plus $3 million in minimum annual royalties. (Ciani Decl., Ex. P.) This was MBG's endgame: a shakedown predicated on baseless allegations of infringement to cash in on the success of Rag & Bone's Miramar Collection.

When Rag & Bone rejected this offer, MBG escalated its pressure campaign by sending letters to Rag & Bone's investors and key advertising and retail business partners (including Klaviyo, Nordstrom, and Saks) threatening that continued use of the term "Miramar" in connection with the Collection was unlawful and that each would be liable. (Ciani Decl., Exs. Q-S.) MBG also sent takedown notices to Meta, demanding it remove Rag & Bone's posts identifying the Collection. (Ciani Decl., Exs. T-V; Tr. 182:3-183:2.) As a result, Rag & Bone's social media posts on Meta were disabled and one of its accounts suspended "because [Meta] received notice from a third party [MBG] that the advertisement(s) infringes their intellectual property rights." (Ciani Decl., Ex. V; Tr. 77:5-79:23.)

MBG's threats and accusations caused significant harm. In the SDNY Action, Rag & Bone presented unrefuted evidence that it lost exposure to prospective customers, experienced a reduced ability to drive sales of the Collection, was forced to change its social media strategy, and lost an

opportunity to enhance product recognition of the Collection. (*Id*. at 81:4-82:17; *see* Ciani Decl., Ex. W.)

**F. No Impact on MBG's Business**

Rag & Bone's use of the word "Miramar" has had no discernible impact on MBG's business. To start, there is no evidence of consumer confusion. Despite the widespread publicity and popularity of Rag & Bone's Miramar Collection for over a decade, MBG says it first learned of the Collection and purported "actual confusion" in mid-2025. (Dkt. 23-2 ¶¶17, 25; *cf.* Ciani Decl., Ex. E.) Rag & Bone has never received reports of confusion. (Tr. 38:24-39:11, 83:18-25.) Further, the individuals MBG identifies as "confused" are Ascher's longstanding personal and professional connections and/or have prior familiarity with MBG's business and marks, including "Miramar." (Dkt. 23-3 ¶¶2-5; Dkt. 23-4 ¶¶2-3; Dkt. 23-5 ¶3; Dkt. 23-6 ¶3; Dkt. 23-7 ¶2; Dkt. 23-8 ¶2; Dkt. 23-9 ¶3.) These individuals unquestionably recognize that the Collection is offered by Rag & Bone, not MBG, demonstrating the *absence* of confusion. (Dkt. 23-3 ¶7; Dkt. 23-4 ¶4; Dkt. 23-5 ¶3; Dkt. 23-6 ¶6; Dkt. 23-7 ¶4; Dkt. 23-8 ¶5; Dkt. 23-9 ¶5.) MBG's declarant Dale Waters even testified that his purported "confusion," expressed in a text to Ascher, was "satirical," the product of his "sense of humor." (Tr. 103:17-104:5; 107:25-108:8.) Christopher Smith (a board member and CEO of MBG's sports division) admitted that (unidentified) people who expressed "confusion" to him were already familiar with MBG and its Miramar mark, and he was not sure how they learned about the Collection. (Tr. 123:7-23, 125:16-19.) He also conceded that "people" are "beginning to understand that there is no connection between MBG and Rag & Bone." (*Id*. 117:20-118:6.)

MBG asserts that it has or will suffer "licensee attrition" because of the Miramar Collection. (Am. Compl. ¶32.) But there is no evidence that MBG has

lost either existing or prospective business as a result of Rag & Bone's use of "Miramar" for the Collection. Rather, Mr. Smith testified that MBG has been trying to license the Miramar mark for the last six or seven years (Tr. 113:3-6), but (per Ascher), has struggled to obtain any licenses for it because of the pandemic's effect on beachgoing (*id*. 135:15-23, 193:11-15). MBG's licensing agent Susan Valero testified she approached roughly 50 potential licensees from March to August 2025; none were interested in licensing Miramar from MBG and none suggested that Rag & Bone had anything to do with it. (Ciani Decl., Ex. X at 47:10-13, 95:18-97:11.) Another MBG witness, Greg Lorber, testified that he would have only entered a deal with MBG *if* Rag & Bone had collaborated with MBG. (Ciani Decl., Ex. Y at 104:13-105:12.)

MBG's only purported evidence of lost prospective business—a speculative business arrangement with Neal Kusnetz—is contradicted by sworn testimony. Around February 9, 2025, MBG entered into a *nonbinding* term sheet with Neal Kusnetz to license various brands, including Miramar. (Tr. 193:19-24, 194:13-195:7.) As Mr. Ascher testified, a term sheet by itself, without an eventual license agreement, "mean[s] nothing." (Tr. 194:13-22, 203:7-10.) MBG and Kusnetz never entered into a licensing agreement. Mr. Kusnetz testified that they never secured retail and wholesale partners or did *any* work towards a binding commitment to license the Miramar mark; "not much got done" after the term sheet was signed. (Ciani Decl., Ex. Z at 190:13-25; *see id*. at 160:5-163:4, 164:20-22, 191:18-192:20.) He had already determined in March 2025 that he would not move forward with the license until at least 2026. (*Id*. at 188:2-190:2.) The same day Rag & Bone rejected MBG's invitation to negotiate a multi-million-dollar licensing deal, Mr. Ascher informed Mr. Kusnetz of Rag & Bone's use of the word "Miramar," prompting an email from Mr. Kusnetz purportedly expressing concern about the "Miramar" transaction, despite having

made no progress towards any licensing deal.[2] (Ciani Decl., Ex. O; Ex. Z at 190:13-25, 192:21-193:5, 197:9-16.)

MBG's theory that it has been harmed by Rag & Bone's purported saturation of the market and so-called "marketplace and search-result displacement" is equally unsupported. (Am. Compl. ¶38.) The so-called displacement evidence MBG provides consists of various online screenshots showing MBG's products appearing side-by-side with (or even *before*) Rag & Bone products—illustrating the absence of confusion and no "displacement" at all. (Dkts. 22-5, 22-6, 22-7.) Moreover, MBG fails to offer any evidence (or even allegations) demonstrating a *more prominent* marketplace presence prior to Rag & Bone's allegedly wrongful conduct, necessarily defeating any argument that its prominence has been *changed* by Rag & Bone's use of "Miramar."

**G. The First-Filed SDNY Action**

On November 30, 2025, Rag & Bone initiated the SDNY Action. Its complaint seeks a declaratory judgment of non-infringement under the Lanham Act and New York law and alleges that MBG tortiously interfered with Rag & Bone's business relations. (*See* Ciani Decl., Ex AA ¶¶92-93, 103.) The central issue in that case is identical to the central issue in this one—whether Rag & Bone's use of "Miramar" constitutes infringement or unfair competition.

On December 3, 2025, following a two-hour hearing, District Judge Lorna Schofield entered a TRO enjoining MBG from continuing its tortious conduct. (*See* Ciani Decl., Ex W.) The court found that Rag & Bone had "already lost," and absent immediate relief, "will continue to lose, valuable opportunities to

[2] In the SDNY Action, Rag & Bone has moved for an adverse inference based on compelling evidence that Mr. Ascher asked Mr. Kusnetz to *create* evidence of his continued interest in a transaction and the purported obstacle presented by Rag & Bone's presence in the marketplace. (*See* SDNY Dkt. 98.)

enhance brand and product recognition" and "the loss of goodwill and reputation" if it "cannot use the name of [its] featured products [the Collection] in [its] marketing, advertising, and promotional activity[.]" (*Id.* ¶6.) It concluded that Rag & Bone's claims "raised serious questions as to the likelihood of confusion," given that the Miramar "trademark as used by MBG is relatively weak[,]" "the parties' products at issue are sold in different places and are purchased by different consumers[,] and the products themselves are quite different in nature and quality." (*Id.* ¶8.) The court enjoined MBG from "initiating, taking or otherwise facilitating Interference[,]" with Rag & Bone's "sale, use, or distribution of goods bearing, or labeled under, the MIRAMAR name." (*Id.* ¶10.) MBG thereafter sought (and received) a 40-day extension to the briefing and hearing schedule, thereby voluntarily extending the TRO relief. (SDNY Dkt. 34, 36.)

On January 4, 2026, more than a month after Rag & Bone filed the SDNY Action and obtained the TRO, MBG filed its complaint in this Court. (Dkt. 1.) MBG filed its answer in the SDNY Action on February 13, 2026. Despite its claims of purported infringement here, MBG's Answer in the SDNY Action asserts no counterclaims. (SDNY Dkt. 71.)

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy that is never awarded as of right." *Diamond Sands Apartments, LLC v. Clark Cnty. Nev.*, 164 F.4th 759, 761 (9th Cir. 2026) (quotation omitted). A party "must demonstrate (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010). An injunction "should not be granted unless the movant, *by a clear showing*, carries the burden

of persuasion." *Apartment Ass'n of Los Angeles Cnty., Inc. v. City of Los Angeles*, 10 F.4th 905, 912 (9th Cir. 2021) (quotation omitted).

## ARGUMENT

## I. MBG Is Not Likely to Succeed on the Merits of Any of Its Claims

MBG is unlikely to succeed on the merits of its claims. As this Court has explained, "false designation of origin claims and state and federal unfair competition claims predicated upon alleged infringement are subject to the same analysis as Lanham Act trademark infringement claims." *Doctor's Best Inc. v. Nature's Way Prods., LLC*, No. 23-CV-0766-KK-KES, 2024 WL 1866134, at *8 (C.D. Cal. Mar. 29, 2024), *aff'd*, 143 F.4th 1101 (9th Cir. 2025). All three claims, therefore, hinge on whether Rag & Bone's use of the mark is likely to cause confusion. *Id*.

### A. There Is No Likelihood of Consumer Confusion

Courts in this Circuit apply the eight-factor *Sleekcraft* balancing test to assess likelihood of confusion. *See JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1106 (9th Cir. 2016). Here, the *Sleekcraft* factors compel the conclusion that no ordinary prudent purchaser is likely to be confused by Rag & Bone's use of "Miramar" to describe its distinctive denim-printed clothing Collection.[3]

[3] In arguing otherwise, MBG relies heavily on the USPTO's nonfinal rejection of RB Topco Sagl's (a Rag & Bone affiliate) trademark registration application. (Dkt. 23 at 8-10.) But this remarkably thinly reasoned "non-final action…is not binding on this Court," *JMAS Enters., Inc. v. Kassir Imp.-Exp. Co.*, No. 11-CV-06258-SVW-PJW, 2011 WL 13221007, at *3 (C.D. Cal. Aug. 24, 2011), which must "do its own analysis of" the *Sleekcraft* factors. *Blue Bottle Coffee, LLC v. Liao*, No. 21-CV-06083-CRB, 2024 WL 2061259, at *12 (N.D. Cal. May 7, 2024).

Factor 1: Strength of MBG's Mark

MBG bears the burden to show the strength of its MIRAMAR mark. It has made no *relevant* argument on this point, so it must lose. *See infra*. In any event, its mark is weak.

"To determine a mark's conceptual strength," courts "classify a mark along a spectrum of five categories ranging from strongest to weakest: arbitrary, fanciful, suggestive, descriptive, and generic." *JL Beverage*, 828 F.3d at 1107. A descriptive mark is one that "define[s] a particular characteristic of the product in a way that does not require any imagination." *Id*.

MBG itself says the mark defines a geographical source: it was "[f]ounded . . . on the shores of California's Miramar Beach." (Dkt. 22-1 at 19.) ("Miramar" may also refer to any number of locations, typically in connection with oceans or beaches.) MBG's Miramar mark is therefore "geographically descriptive" in that it "'designates geographical location and would tend to be regarded by buyers as descriptive of the geographic location or origin of the goods or services.'" *Sand Hill Advisors, LLC v. Sand Hill Advisors, LLC*, 680 F.Supp.2d 1107, 1113 (N.D. Cal. 2010) (quoting *Forschner Group, Inc. v. Arrow Trading Co., Inc.*, 30 F.3d 348, 355 (2d Cir. 1994)). At most, "Miramar" is weakly "suggestive" of the *concept* of oceans, beaches, coasts, vistas, and the attendant lifestyle.

Moreover, "[w]idespread use of similar marks within an industry is further evidence that the trademark at issue is weak." *Visa Int'l Serv. Ass'n v. E. Fin. Fed. Credit Union*, 967 F.2d 596, 1992 WL 138231 (Table), at *2 (9th Cir. 1992). Trademarks in Class 25 include "MIRAMAR CLUB," "MIRAMAR BEACH," and "MIRAMAR EXPRESS," none of which are registered to MBG. *Supra* p.7. More to the point, numerous third parties, including other prominent retailers, use the term "Miramar" on and in connection with clothing to identify

the style, line, or collection to which they belong. *Supra* p.7. As the SDNY court already found, therefore, MBG's "Miramar" mark is weak. (Ciani Decl., Ex W ¶8.)

MBG's *only* argument on this point is that MBG's registration is "longstanding and incontestable." (Dkt. 23 at 9.) But "the question of incontestability is not relevant to a likelihood of confusion analysis as it does not establish a mark's strength." *VenVest Ballard, Inc. v. Clockwork, Inc.*, No. ED-CV-1400195-MWF(EX), 2015 WL 12745801, at *7 (C.D. Cal. Feb. 11, 2015); *see Visa Int'l*, 1992 WL 138231 (Table), at *1 ("[T]he incontestable validity of its trademarks has nothing to do with how strong its marks are."). Having made just this irrelevant argument, MBG necessarily loses; it cannot make a "*clear showing*" to carry its burden. *Apartment Ass'n*, 10 F.4th at 912.

Factor 2: Proximity or Relatedness of the Products

Under this factor, courts consider "whether the products are likely to be connected in the mind of a prospective purchaser." *Mattel, Inc. v. MGA Ent., Inc.*, 782 F.Supp.2d 911, 1008 (C.D. Cal. 2011) (quotation marks omitted).

Although both MBG and Rag & Bone sell apparel, "the mere fact that two products or services fall within the same general field … does not mean that the two products or services are sufficiently similar to create a likelihood of confusion." *Matrix Motor Co., v. Toyota Jidosha Kabushiki Kaisha*, 290 F.Supp.2d 1083, 1092 (C.D. Cal. 2003) (quotation omitted). "The proximity of goods is measured by whether the products are: (1) complementary; (2) sold to the same class of purchasers; and (3) similar in use and function." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1150 (9th Cir. 2011). All three considerations weigh against proximity.

As the SDNY court already found, the parties' apparel products differ in nature and quality, channel of distribution, customer demographic, and price.

*Supra* p.12. Their products are "neither used nor promoted together" and so "not complementary." *Matrix Motor*, 290 F.Supp.2d at 1092. Their products are "sold to different classes of purchasers and worn by different groups of end-users," which "weighs against [] proximity or relatedness." *Abercrombie & Fitch Co. v. Moose Creek, Inc.*, No. CV-06-6245-AHM(SSX), 2007 WL 4973852, at *11 (C.D. Cal. Aug. 17, 2007). Lastly, Rag & Bone sells high-end, contemporary clothing at premium price points, whereas MBG principally sells volleyballs and casual beachwear apparel at lower prices. *Supra* pp.3, 6. The products differ in their "use and function." *Network Automation*, 638 F.3d at 1150.

This factor strongly weighs against MBG. *See Icebreaker Ltd. v. Gilmar S.P.A.*, 911 F.Supp.2d 1099, 1101, 1104-05 (D. Or. 2012) (products not proximate where "Plaintiff designs, markets, and sells its clothing as performance active wear" but Defendant offers "high-end fashion sportswear and leisure apparel").

<u>Factor 3: Similarity of the Marks</u>

In analyzing this factor, "[t]he marks must be considered in their entirety and as they appear in the marketplace." *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1392 (9th Cir. 1993). "Similarity of the marks is tested on three levels: sight, sound, and meaning." *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 351 (9th Cir. 1979).

Rag & Bone uses "Miramar" as a secondary, non-source designation in the marketplace. It is invariably accompanied by the RAG & BONE house mark—itself a distinctive, fanciful mark, in its signature lowercase typeface—or used within Rag & Bone stores and on its webpage so that it is clear to customers that Rag & Bone is the source of the Collection. (Tr. 71:16-72:21.) As this Court recognizes, the use of a prominent house mark "reduces the effect

of the similarity and likelihood of confusion because that is how the mark is encountered in the marketplace." *VenVest*, 2015 WL 12745801, at *7.

In addition, although both use the word "Miramar," the two marks do not have the same meaning. As explained above, *supra* p.14, MBG uses the word "Miramar" to describe the geographic origin of its products. Rag & Bone, on the other hand, uses the word in a fanciful sense to identify an apparel collection made with a unique printing technique. *Supra* p.3. Accordingly, this factor favors Rag & Bone.

<u>Factor 4: Actual Confusion</u>

MBG has not provided evidence of actual confusion. The relevant inquiry is "whether an alleged trademark infringer's use of a mark creates a likelihood that the *consuming public* will be confused as to who makes what product." *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 632 (9th Cir. 2008) (emphasis added). A plaintiff must present evidence of confusion from individuals who properly "reflect the views of the purchasing public." *Walter v. Mattel, Inc.*, 210 F.3d 1108, 1111 (9th Cir. 2000) (quotation omitted).

MBG offers only declarations and testimony from Ascher's friends and colleagues, which do not—and cannot—show that the consuming public is or is likely to be confused. The declarations *themselves* attest that the declarant has a longstanding relationship with Ascher and/or MBG. *Supra* p.9. These declarations "do not … reflect the views of the purchasing public." *Norm Thompson Outfitters, Inc. v. Gen. Motors Corp.*, 448 F.2d 1293, 1297 (9th Cir. 1971) (quotation omitted).

As the Ninth Circuit has explained, "[t]rademark law is skeptical of the ability of an associate of a trademark holder to transcend personal biases to give an impartial account." *Self–Realization Fellowship Church v. Ananda Church of Self–Realization*, 59 F.3d 902, 910 (9th Cir. 1995). Thus, "testimony of

friends and business associates cannot be used for the *Sleekcraft* 'evidence of actual confusion' factor." *S10 Ent. & Media LLC v. Samsung Elecs. Co.*, No. 2:21-CV-02443-CAS-JPRX, 2023 WL 2090703, at *8 (C.D. Cal. Feb. 14, 2023); *see also Walter*, 210 F.3d at 1111 ("evidence of actual confusion from acquaintances, friends, and family [is] insufficient" to show actual confusion).

In any event, the declarants each recognized that the Collection is offered by Rag & Bone, reflecting an absence of confusion. Most, if not all, of the declarants' "confusion" concerns whether MBG entered into a licensing arrangement with Plaintiffs. (Dkt. 23-5, 23-7-9; *cf. also* Dkt. 23-3.) But "[t]rademark infringement protects only against mistaken *purchasing decisions*," *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 677 (9th Cir. 2005) (quotation marks omitted), not a handful of questions regarding a potential collaboration.

<u>Factor 5: Marketing Channels Used</u>

Under this factor, "courts consider whether the parties' customer bases overlap and how the parties advertise and market their products." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1130 (9th Cir. 2014). In other words, it "requires the court to consider whether the predominant purchasers of the parties' goods are similar or different, and whether the marketing approaches used resemble each other." *Contender Partners, LLC v. Azteca Int'l Corp.*, No. CV-08-02026-MMM(JTLX), 2008 WL 11334492, at *15 (C.D. Cal. May 19, 2008). The parties' products are sold through different channels to different customer bases. *See supra* p.6. This factor therefore weighs in favor of Rag & Bone. MBG asserts only that "the primary marketing channels for both parties are online channels." (Dkt. 23 at 10.) But "it would be the rare commercial retailer that did not advertise online, and the shared use of a ubiquitous

marketing channel does not shed much light on the likelihood of consumer confusion." *Network Automation*, 638 F.3d at 1151.

Factor 6: Type of Goods and the Degree of Care Likely to be Exercised by the Purchaser

"[W]hen the goods are expensive, the buyer can be expected to exercise greater care in his purchases." *Network Automation*, 638 F.3d at 1152. The Collection consists of high-end, premium priced products, most of which sell for $200-$240. *Supra* pp.3-4. Indeed, this court has previously held that "a reasonable jury could find that a buyer would exercise a high degree of care when purchasing clothing that costs up to $200 per item." *Legator v. Nordstrom, Inc.*, No. CV 11-4136-PA(EX), 2011 WL 13220707, at *10 (C.D. Cal. Dec. 29, 2011). This factor favors Rag & Bone.

Factor 7: Rag & Bone's Intent in Selecting the Mark

To succeed on this factor, a plaintiff must demonstrate that, *at the time the defendant selected the mark (i.e., over 13 years ago)*, "the defendant knew of the [plaintiff's] mark, should have known of the mark, intended to copy the plaintiff, failed to conduct a reasonably adequate trademark search, or otherwise culpably disregarded the risk of reverse confusion." *Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d 927, 934-35 (9th Cir. 2017) (emphasis added).

MBG has not provided any evidence of Rag & Bone's intent in selecting the term "Miramar." Although MBG argues this factor weighs in its favor because "the USPTO [has] specifically advised Rag & Bone that there is a likelihood of confusion," (Dkt. 23 at 10), that is not relevant. The analysis assesses the defendant's intent at the time it began the allegedly infringing use, "not whether it continued … after being notified of potential infringement." *Billfloat Inc. v. Collins Cash Inc.*, No. 20-CV-09325-EMC, 2022 WL 2158970, at *2 (N.D. Cal. June 15, 2022). This factor is, at best, neutral.

Factor 8: Likelihood of Expansion of the Product Lines

This factor requires that MBG demonstrate "a strong possibility of expansion into competing markets." *M2 Software, Inc. v. Madacy Ent.*, 421 F.3d 1073, 1085 (9th Cir. 2005) (quotation marks omitted). But MBG only asserts that this factor weighs in its favor because "MBG is inherently likely to expand its MIRAMAR® brand into other new markets." (Dkt. 23 at 10.) Such uncorroborated speculation does not demonstrate a "strong possibility" that MBG will expand its Miramar brand into a competing market with Rag & Bone.

**B. Laches Bars MBG's Claims**

Courts in this Circuit use a two-step laches analysis. For the first step, courts "assess the plaintiff's delay by looking to whether the most analogous state statute of limitations has expired." *Pinkette Clothing, Inc. v. Cosm. Warriors Ltd.*, 894 F.3d 1015, 1025 (9th Cir. 2018). If the relevant statute expired before suit was filed, "there is a strong presumption in favor of laches." *Id.* In this case, the relevant statute of limitations is four years. *See id.*; Cal. Bus. & Prof. Code § 17208.

MBG "knew or should have known about its potential cause of action" well over four years before it filed its Complaint. *Tillamook Country Smoker, Inc. v. Tillamook Cty. Creamery Ass'n*, 465 F.3d 1102, 1108 (9th Cir. 2006). Rag & Bone has continuously sold the Collection since 2013, and the Collection has received favorable and prominent publicity since its launch. *Supra* p.4.[4] The presumption of laches is warranted.

[4] MBG suggests that use of "Miramar," by itself, *as a mark* began recently, but does not point to any change to the Collection in 2025 beyond an increased advertising spend and the opening of three "Rag & Bone | Miramar" pop-up stores, each of which has closed or no longer operates under that name. *Supra* p.5. Indeed, advertisements and press reflect that Rag & Bone has used the word "Miramar" as it currently does since 2013. (*See* Ciani Decl., Exs. E-F.)

At the second step, courts "assess the equity of applying laches" with six factors: "(1) 'strength and value of trademark rights asserted;' (2) 'plaintiff's diligence in enforcing mark;' (3) 'harm to senior user if relief denied;' (4) 'good faith ignorance by junior user;' (5) 'competition between senior and junior users;' and (6) 'extent of harm suffered by junior user because of senior user's delay.'" *Pinkette Clothing*, 894 F.3d at 1025 (quoting *E-Sys., Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir. 1983)).

Each factor supports applying laches. *See supra* p.14 (strength of the mark); p.7 (MBG's failure to enforce its mark); pp.21-22 (lack of harm to MBG); p.19 (Rag & Bone's lack of bad faith); p.6 (absence of competition between Rag & Bone and MBG); p.5 (substantial investment by Rag & Bone in growing and promoting the Collection); *see also Grupo Gigante SA De CV v. Dallo & Co.*, 391 F.3d 1088, 1105 (9th Cir. 2004) ("[A] defendant can make the required showing of prejudice by proving that it has continued to build a valuable business … during the time that the plaintiff delayed.").

## II. MBG Fails to Show Irreparable Harm

MBG first demanded that Rag & Bone stop selling the Collection nine months ago. It filed this case in January, after voluntarily obtaining an extension of the briefing schedule on Rag & Bone's motion for a preliminary injunction in the SDNY court, thereby extending the TRO entered against it. *Supra*, p.12. Only in June did it seek a preliminary injunction. And just last week, MBG offered to delay the adjudication of its motion if Rag & Bone agreed to waive certain arguments *about MBG's delay* (Dkt. 30 at 3); this attempted horse-trade confirms that its asserted immediate and irreparable harm is a contrivance for use as leverage and a bargaining chip, not a reality MBG is experiencing. Delay and gamesmanship alone are fatal to MBG's assertion of irreparable injury requiring urgent relief. But MBG also provides no credible evidence of lost

business, consumer confusion, or marketplace displacement. *Supra*, p.9. No changed circumstances justify the delay; to the contrary, MBG's board member recently testified that alleged confusion in the marketplace was dissipating. *Supra*, p.9.

MBG instead argues that irreparable harm should be presumed based on its likely success on the merits (Dkt. 23 at 11), but that presumption is "no longer the case" in this Circuit and "[i]rreparable harm will not be presumed simply because it is a trademark infringement action; rather it must be demonstrated" by facts and evidence. *Cal. Power Athletes, Inc. v. Cali Power Inc.*, No. 8:25-CV-02224-DOC-KES, 2025 WL 3691843, at *4 (C.D. Cal. Dec. 2, 2025) (citing *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013)).

MBG also points to its purported expert evaluation as evidence of harm. (Dkt. 23 at 11-12; Dkt. 23-10.) But MBG has alleged that the "commercial harm to MBG's licensing business is concrete and quantifiable," (Am. Compl. ¶32), and "[m]ere financial injury does not constitute irreparable harm if adequate compensatory relief will be available." *Premier Nutrition, Inc. v. Organic Food Bar, Inc.*, 475 F.Supp.2d 995, 1007 (C.D. Cal. 2007) (citation omitted). MBG's purported expert only asserts in conclusory fashion that MBG will suffer irreparable long-term harm to its Miramar brand (Dkt. 23-10 ¶11)—an evaluation "grounded in platitudes rather than evidence, and relat[ing] neither to whether 'irreparable injury is *likely* in the absence of an injunction,' nor to whether legal remedies, such as money damages, are inadequate." *Herb Reed Enters., LLC*, 736 F.3d at 1250 (citation omitted).

MBG thus fails to make the essential showing of irreparable harm. *See Ramirez v. Martinez*, No. 5:17-cv-02211-FMO-DTB, 2018 WL 4846795, at *4-

5 (C.D. Cal. June 18, 2018) (trademark-infringement injunction denied where "plaintiffs have not shown why monetary relief would be inadequate").

**III. The Balance of Equities Strongly Favors Rag & Bone**

In balancing the equities, courts "consider the hardships each party is likely to suffer if the other prevails." *City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 944 F.3d 773, 806 (9th Cir. 2019). As explained, *supra* pp.20-22, MBG fails to show that it would suffer harm absent injunctive relief.

Rag & Bone, on the other hand, would suffer significant irreparable harm from an injunction. It will be barred from further commercial use of the word "Miramar." (Dkt. 23 at 13.) That means it will be forced to stop promoting and selling its most popular products, necessarily damaging the significant goodwill and product recognition it has built over more than a decade of cultivating and promoting the Collection.

Moreover, MBG's requested relief directly conflicts with the TRO entered in the SDNY Action, which protects Rag & Bone's ability to continue using the word "Miramar" pending a decision on a fully-briefed preliminary injunction motion. (Ciani Decl., Ex. W.) Granting MBG's motion would create needless judicial inconsistency and impair the interests of comity. (*See* Dkt. 19-1 at 13-14; Dkt. 25 at 8, 10-11.)

**IV. Public Interest Weighs Against Granting an Injunction**

"[L]ikelihood of confusion to consumers is a critical factor in our consideration of the harm to the public." *Aurora World, Inc. v. Ty Inc.,* 719 F.Supp.2d 1115, 1170 (C.D. Cal. 2009). Where there is no such likelihood, an injunction wrongly "depriv[es] consumers of a choice of products." *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.,* 4 F.3d 819, 827 (9th Cir. 1993). As discussed *supra* pp.13-20, MBG fails to demonstrate that Rag & Bone's use of "Miramar"

creates a likelihood of consumer confusion. "[T]here is no significant threat to the public interest in the absence of injunctive relief," *Fizz Soc. Corp. v. Maplebear, Inc.*, 791 F.Supp.3d 990, 1021 (N.D. Cal. 2025), and the public interest weighs against it.

## CONCLUSION

This Court should deny MBG's Motion.

Dated: July 7, 2026

**KATTEN MUCHIN ROSENMAN LLP**

By: */s/ David Halberstadter*
Attorneys for Defendant Rag & Bone Holdings, LLC

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Rag & Bone, certifies that this brief contains 6,964 words, which complies with the word limit of L.R. 11-6.1.

Dated: July 7, 2026

**KATTEN MUCHIN ROSENMAN LLP**

By: */s/ David Halberstadter*
Attorneys for Defendant Rag & Bone Holdings, LLC